**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

No. 14-1148

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

GEORGE W. FINCH and JOHN DENNIS HONEYCUTT,

Petitioners,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE,

Respondent,

ON PETITION FOR REVIEW OF AN ORDER OF THE DEPARTMENT OF
AGRICULTURE

**PROOF BRIEF FOR RESPONDENT**

JOYCE R. BRANDA
  *Acting Assistant Attorney
  General*

MICHAEL S. RAAB
THOMAS PULHAM
  *(202) 514-4332*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7323*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies:

### A.    <u>Parties and Amici</u>

The petitioners are George W. Finch and John Dennis Honeycutt. The respondent is the United States Department of Agriculture.

There are no amici.

### B.    <u>Ruling Under Review</u>

Petitioners seek review of a June 6, 2014, decision and order of the Department of Agriculture. The decision is not yet published in Agriculture Decisions, but is currently available at 2014 WL 4311062, and can also be found in the Joint Appendix at pages JA __-__.

### C.    <u>Related Cases</u>

The government is not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Respectfully submitted,

 /s/ Thomas Pulham
Thomas Pulham

# TABLE OF CONTENTS

**Page(s)**

GLOSSARY..................................................................................... viii

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES...............................................................1

PERTINENT STATUTES AND REGULATIONS...................................2

STATEMENT OF THE CASE..................................................................2

    A.    The Perishable Agricultural Commodities Act ......................2

    B.    Factual and Procedural Background .....................................5

SUMMARY OF ARGUMENT ...............................................................11

STANDARD OF REVIEW ....................................................................13

ARGUMENT ........................................................................................13

    I.    PETITIONERS WERE RESPONSIBLY CONNECTED TO THIRD COAST DURING THE PERIOD OF VIOLATION ............13

        A.    The Judicial Officer's Conclusion That Petitioners Were Responsibly Connected to Third Coast Is Supported by Substantial Evidence and Consistent with Law ......................13

        B.    Petitioners' Arguments Regarding Their Connection to Javier Bueno's Embezzlement Do Not Affect the Analysis.....18

    II.    PETITIONERS' CHALLENGES TO PACA LACK MERIT ...........23

        A.    Petitioners Misapprehend the Statutory Framework ...............23

        B.    PACA Does Not Violate the Due Process Clause ....................26

i

C.    PACA Is Not a Bill of Attainder................................................28

D.    Petitioners' Remaining Arguments Are Without Merit............31

CONCLUSION .......................................................................................33

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Ass'n of Bituminous Contractors, Inc. v. Apfel*,
156 F.3d 1246 (D.C. Cir. 1998)...........................................................26

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
681 F.3d 427 (D.C. Cir. 2012).............................................................32

*Bama Tomato Co. v. U.S. Dep't of Agric.*,
112 F.3d 1542 (11th Cir. 1997)...........................................................32

*Bell v. Dep't of Agric.*,
39 F.3d 1199 (D.C. Cir. 1994).............................................................16

*BellSouth Corp. v. FCC*,
162 F.3d 678 (D.C. Cir. 1998).............................................................29

*Birkenfield v. United States*,
369 F.2d 491 (3d Cir. 1966)................................................................26

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council*,
467 U.S. 837 (1984) ...........................................................................22

*City of Newport v. Fact Concerts, Inc.*,
453 U.S. 247 (1981) ...........................................................................30

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) ...........................................................................27

*Conn v. Gabbert*,
526 U.S. 286 (1999) ...........................................................................27

*Coosemans Specialties, Inc. v. Gargiulo*,
485 F.3d 701 (2d Cir. 2007) ..............................................................24

---

*Authorities upon which we chiefly rely are marked with an asterisk.

*Corley v. United States*,
  556 U.S. 303 (2009) ..........................................................................20

*Doe v. District of Columbia*,
  93 F.3d 861 (D.C. Cir. 1996)...........................................................28

*Electrolert Corp. v. Barry*,
  737 F.2d 110 (D.C. Cir. 1984)..........................................................32

*Flemming v. Nestor*,
  363 U.S. 603 (1960) ..........................................................................30

*Hawkins v. Agric. Mktg. Serv.*,
  10 F.3d 1125 (5th Cir. 1993) ....................................................... 25, 26

*Hettinga v. United States*,
  677 F.3d 471 (D.C. Cir. 2012)..........................................................29

*\*Jacobson v. Dep't of Agric.*,
  99 F. App'x 238 (D.C. Cir. 2004) ........................................ 14, 15, 19

*J.J. Cassone Bakery, Inc. v. NLRB*,
  554 F.3d 1041 (D.C. Cir. 2009)........................................................13

*Johnson v. SEC*,
  87 F.3d 484 (D.C. Cir. 1996)............................................................31

*JSG Trading Corp. v. U.S. Dep't of Agric.*,
  176 F.3d 536 (D.C. Cir. 1999).................................................. 2, 22, 31

*\*Kleiman & Hochberg, Inc. v. U.S. Dep't of Agric.*,
  497 F.3d 681 (D.C. Cir. 2007).................................... 2, 3, 13, 17, 19, 20, 22, 26

*Kuretski v. Commissioner*,
  755 F.3d 929 (D.C. Cir. 2014)..........................................................27

*Martino v. U.S. Dep't of Agric.*,
  801 F.2d 1410 (D.C. Cir. 1986)........................................................18

iv

*Norinsberg v. U.S. Dep't of Agric.*,
162 F.3d 1194 (D.C. Cir. 1998)..................................................... 4, 25

*Norinsberg, In re*,
58 Agric. Dec. 604 (U.S.D.A. 1999) ...............................................14

*Perfectly Fresh Farms, Inc. v. U.S. Dep't of Agric.*,
692 F.3d 960 (9th Cir. 2012) ................................................ 14, 15, 19

*Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*,
758 F.3d 296 (D.C. Cir. 2014)........................................................28

*Siegel v. Lyng*,
851 F.2d 412 (D.C. Cir. 1988)............................... 18, 21, 26, 28, 29, 30

*Taylor v. U.S. Dep't of Agric.*,
636 F.3d 608 (D.C. Cir. 2011).................................... 14, 17, 20, 21, 25

*Taylor, In re*, PACA App. Nos. 06-0008, 06-0009,
2012 WL 9511765 (U.S.D.A. Dec. 18, 2012).....................................21

*Third Coast Produce Company, Ltd., In re*, No. 12-0234
(U.S.D.A. Apr. 27, 2012) , *available at* http://www.dm.usda.gov/
oaljdecisions/120427_12-0234_DO_ThirdCoastProduceCompanyLtd.pdf ......7, 8

*Tri-County Wholesale Produce Co. v. U.S. Dep't of Agric.*,
822 F.2d 162 (D.C. Cir. 1987)..........................................................2

*United States v. Brown*,
381 U.S. 437 (1965) .....................................................................30

*United States v. Lovett*,
328 U.S. 303 (1946) .....................................................................29

*Veg-Mix, Inc. v. U.S. Dep't of Agric.*,
832 F.2d 601 (D.C. Cir. 1987)................................................ 3, 17, 26

*Virginia v. Hicks*,
539 U.S. 113 (2003) .....................................................................32

*Weis-Buy Servs., Inc. v. Paglia*,
    411 F.3d 415 (3d Cir. 2005) ...................................................................24

*Zwick v. Freeman*,
    373 F.2d 110 (2d Cir. 1967) ................................................. 26, 27, 28

## Statutes:

Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a-499s ........................2

    7 U.S.C. § 499a(b)(5)-(7) ....................................................................3

    7 U.S.C. § 499a(b)(9) .........................................................................4

    *7 U.S.C. § 499b(4)................................................ 3, 7, 10, 11, 16

    7 U.S.C. § 499c(a) ...............................................................................3

    7 U.S.C. § 499d(b) .......................................................... 4, 10, 11, 32

    7 U.S.C. § 499e(c)(2) .........................................................................24

    7 U.S.C. § 499h(a) ..............................................................................3

    7 U.S.C. § 499h(b) ........................................................... 4, 10, 11, 32

11 U.S.C. § 523(a)(4)..............................................................................25

28 U.S.C. § 2342(2) .................................................................................1

28 U.S.C. § 2462 ....................................................................................31

42 U.S.C. § 1983 ....................................................................................30

## Regulations:

7 C.F.R. § 2.35(a).....................................................................................8

**Legislative Materials:**

H.R. Rep. No. 104-207 (1995)................................................................4, 5

S. Rep. No. 84-2507 (1956) ..................................................................22

# GLOSSARY

| | |
|---|---|
| AR No. | Document in the certified list of the administrative record |
| Department | Department of Agriculture |
| Director | Director of the PACA Division of the Department's Agricultural Marketing Service |
| GFRX | Exhibit in the PACA Director's agency record in *In re George Finch*, PACA Docket No. 13-0068 |
| JA | Joint Appendix |
| JHRX | Exhibit in the PACA Director's agency record in *In re John Honeycutt*, PACA Docket No. 13-0069 |
| Op. | Judicial Officer's decision and order of June 6, 2014 |
| PACA | Perishable Agricultural Commodities Act |
| Secretary | Secretary of Agriculture |
| Third Coast | Third Coast Produce Company, Ltd. |
| Tr. | Transcript of petitioners' hearing before the Chief Administrative Law Judge on August, 13, 2013 |

## STATEMENT OF JURISDICTION

In a decision and order entered on June 6, 2014, the Judicial Officer of the Department of Agriculture determined that petitioners were responsibly connected with Third Coast Produce Company, Ltd., during the period of time when Third Coast violated the Perishable Agricultural Commodities Act.  The Judicial Officer accordingly ordered that petitioners were subject to the licensing and employment restrictions imposed by the Act.  Op. 23 (JA __-__).[1]  Petitioners filed a timely petition for review in this Court on August 15, 2014.  This Court has jurisdiction under 28 U.S.C. § 2342(2).

## STATEMENT OF THE ISSUES

1.    Whether the Judicial Officer's determination that petitioners were responsibly connected with Third Coast Produce Company, Ltd., during the period of time when the company willfully, flagrantly, and repeatedly violated the Perishable Agricultural Commodities Act, is reasonable, consistent with law, and supported by the record.

2.    Whether the imposition of licensing and employment restrictions on individuals responsibly connected with a firm that willfully, flagrantly, and

---

[1] Citations to the Judicial Officer's decision and order are abbreviated "Op." Citations to other documents in the certified list of the administrative record are abbreviated "AR No. [item number]."  Citations to the Joint Appendix are abbreviated "JA."

1

repeatedly violated the Perishable Agricultural Commodities Act violates the Due Process Clause of the Fifth Amendment.

3.     Whether the Perishable Agricultural Commodities Act constitutes a bill of attainder prohibited by Article I, section 9 of the United States Constitution.

## PERTINENT STATUTES AND REGULATIONS

The relevant provisions of the Perishable Agricultural Commodities Act are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     The Perishable Agricultural Commodities Act

The Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a-499s ("PACA"), was enacted in 1930 to facilitate and regulate interstate and foreign commerce in fresh fruits and vegetables. "Because the 'industry [was] thought to be unusually prone to fraud and to unfair practices,' . . . PACA erected a strict regulatory regime." *Kleiman & Hochberg, Inc. v. U.S. Dep't of Agric.*, 497 F.3d 681, 685 (D.C. Cir. 2007) (alteration in original) (quoting *Tri-County Wholesale Produce Co. v. U.S. Dep't of Agric.*, 822 F.2d 162, 163 (D.C. Cir. 1987)). The goal of the law was to ensure "that only financially responsible persons should be engaged in the businesses subject to the Act." *JSG Trading Corp. v. U.S. Dep't of Agric.*, 176 F.3d 536, 538 (D.C. Cir. 1999) (internal quotation marks omitted).

PACA requires that every person who buys or sells in wholesale significant quantities of perishable agricultural commodities in interstate or foreign commerce must be licensed by the Secretary of Agriculture ("Secretary").  *See* 7 U.S.C. §§ 499a(b)(5)-(7), 499c(a).  "To help instill confidence in parties dealing with each other on short notice, across state lines, and at long distances, [PACA] provides special sanctions against dishonest or unreliable dealing."  *Kleiman & Hochberg*, 497 F.3d at 684 (quoting *Veg-Mix, Inc. v. U.S. Dep't of Agric.*, 832 F.2d 601, 604 (D.C. Cir. 1987)).  Licensees are forbidden to engage in specified manners of unfair conduct, including "to fail or refuse . . . [to] make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had."  7 U.S.C. § 499b(4).  If the Secretary determines that a PACA licensee has engaged in such unfair conduct, the Secretary may suspend the offender's license.  *Id.* § 499h(a).  And "if the violation is flagrant or repeated, the Secretary may, by order, revoke the license of the offender."  *Id.*

A finding of repeated or flagrant violations also has serious consequences for individuals "responsibly connected" with the offending licensee.  Section 499h(b) prohibits any other licensee from employing such a responsibly connected person without the approval of the Secretary.  The Secretary is authorized to approve employment in the industry one year after the finding of responsible connection, upon the posting of a bond, or two years after the finding if no bond is

3

posted. *Id.* § 499h(b). Section 499d(b) further prohibits a responsibly connected individuals from obtaining her own license for two years. *Id.* § 499d(b).

PACA defines "responsibly connected" to mean "affiliated or connected with a [licensee] as (A) partner in a partnership, or (B) officer, director, or holder of more than 10 per centum of the outstanding stock of a corporation or association." *Id.* § 499a(b)(9). But the definition further provides that "[a] person shall not be deemed to be responsibly connected if the person demonstrates by a preponderance of the evidence" two facts: first, "that the person was not actively involved in the activities resulting in a violation of this chapter and," second, "that the person either was only nominally a partner, officer, director, or shareholder of a violating licensee . . . or was not an owner of a violating licensee . . . which was the alter ego of its owners." 7 U.S.C. § 499a(b)(9). PACA thus creates a rebuttable presumption that certain individuals are responsibly connected by virtue of their relationship to a licensee, and then expressly provides such individuals "the opportunity to demonstrate that they were not responsible for the specific violation" and thereby to avoid the employment and licensing restrictions. *Norinsberg v. U.S. Dep't of Agric.*, 162 F.3d 1194, 1197 (D.C. Cir. 1998) (quoting H.R. Rep. No. 104-207, at 11 (1995)); *see also ibid.* (explaining that if the Secretary "determine[s] [that] an individual falls with one of the . . . statutory classifications," then "the burden shifts to the individual to demonstrate that he was

4

not actively involved and that he was either only a nominal officer or not an owner of a licensee within the meaning of the statute.").

### B.    Factual and Procedural Background

**1.**  Beginning in the 1980s, petitioners George W. Finch and John Dennis Honeycutt worked in sales at the same produce company.  Tr. 81-82 (JA __-__).[2] For several years (five for Finch, six for Honeycutt), they "learned from the best company in town," and eventually "saw an opportunity to possibly go out" on their own.  Tr. 81, 40 (JA __, __).  Together with another coworker, Artemio Bueno, petitioners started their own company in May 1992.  Tr. 40 (JA __).

Over the next 18 years, the three men built Third Coast Produce Company, Ltd. ("Third Coast"), into a sizable operation, with 40 distribution trucks, a 60,000 square-foot warehouse, and weekly sales of around $1,000,000.  Tr. 40, 81-82 (JA __, __-__).  Petitioners were primarily responsible for sales and business development, but because the company was essentially a "family-run business," they were involved in "just about everything except for finances."  Tr. 40, 65-66

---

[2] Following the convention used by the Judicial Officer, citations to the transcript of petitioners' August 13, 2013, hearing before the Chief Administrative Law Judge, *see* AR No. 17, are abbreviated "Tr."  Similarly, references to exhibits in the PACA director's agency record, AR No. 3, are abbreviated "GFRX" for exhibits in *In re George Finch*, PACA Docket No. 13-0068,  and "JHRX" for exhibits in *In re John Honeycutt*, PACA Docket No. 13-0069.

(JA __, __-__).  Those were handled by the Chief Financial Officer, Javier Bueno (Artemio's son).  Tr. 41 (JA __).

At its peak, Third Coast was "one of the major distributors in the Houston metropolitan area."  Tr. 43 (JA __).  But it began to experience financial difficulties.  Petitioners first noticed substantial problems with the company's cash flow in 2009.  Op. 21 (JA __); Tr. 68 (JA __).  The company "hit a wall" in January 2010 when some suppliers "cut [it] off" and one of its bank accounts was closed.  Tr. 43-44, 69 (JA __-__, __).  At this point, petitioners took over.  Finch "put [his] nose into the books" to discover what was happening, and called in an outside accounting firm to audit Third Coast's books.  Tr. 43-44 (JA __-__).  When their investigation revealed "a systematic diversion of Third Coast's receivables to previously unknown and unauthorized bank accounts established by Javier Bueno," Op. 21-22 (JA __-__), petitioners together agreed to terminate him, Tr. 74, 89 (JA __, __).  By "[t]he end of January [or] first of February," petitioners had assumed control of Third Coast, including its finances.  Tr. 75 (JA __); *see also* Tr. 52  (JA __) (Finch was acting as "chief operating officer" during that time).

Petitioners were aware of their obligations to make timely payment under PACA.  Tr. 76 (JA __).  As Finch put it, "obviously PACA was the number one payment that we needed to make."  Tr. 55 (JA __).  But even though Third Coast was falling "further and further behind" on its payment to creditors, including

PACA creditors, petitioners continued to purchase produce from various sellers. Tr. 69, 75-76 (JA __, __-__).  Petitioners took various steps to keep their company, including pro-rating payments to creditors, reducing their own salaries (at the bank's insistence, although they continued to take salaries of approximately $100,000), and selling Third Coast's processing facility.  Tr. 55-56, 98 (JA __-__, __).  Around July 2010, Third Coast ceased operations and its assets were sold.  Tr. 96 (JA __); Op. 12-13 (JA __-__).  Petitioners remain employed in the produce industry.  Tr. 78, 94 (JA __, __).

**2.**  On February 15, 2012, the Department of Agriculture ("Department") filed an administrative complaint against Third Coast, alleging that the company had willfully violated 7 U.S.C. § 499b(4) by failing to make full payment promptly for produce it had purchased.  *See In re Third Coast Produce Company, Ltd.*, No. 12-0234, at 1 (U.S.D.A. Apr. 27, 2012), *available at* http://www.dm.usda.gov/ oaljdecisions/120427_12-0234_DO_ThirdCoastProduceCompanyLtd.pdf.     Third Coast substantially admitted the material allegations of the complaint, and the Chief Administrative Law Judge found that "during the period of February 5, 2010, through July 16, 2010," Third Coast "failed to make full payment promptly to 21 sellers of the agreed purchase prices, or balances thereof, in the total amount of $514,943.40 for 207 lots of perishable agricultural commodities which [Third Coast] purchased, received, and accepted in the course of or in contemplation of

7

interstate and foreign commerce." *Id.* at 3-4. The Chief Administrative Law Judge further found that the violations were "willful, flagrant, and repeated." *Id.* at 4. Third Coast did not appeal the decision.

After proceedings were initiated against Third Coast, a Department official notified petitioners that they had been initially determined to be responsibly connected with Third Coast on account of their positions as limited partners and 32.3 percent shareholders in the company. GFRX2 (JA __); JHRX 2 (JA __). Petitioners sought review with the Director of the PACA Division ("Director"), who made the same determination. AR No. 3 (JA __). Petitioners each filed a petition for review of the Director's determination, and the proceedings were consolidated before the Chief Administrative Law Judge. The Chief Administrative Law Judge held a hearing, at which both petitioners testified and offered documentary evidence, cross-examined the sole witness against them, and offered legal argument. *See generally* Tr. 1-120 (JA __-__). After post-hearing briefing, the Chief Administrative Law Judge found each petitioner responsibly connected to Third Coast "by virtue of his active participation in corporate operations and his status as an officer and director." AR No. 21, at 18 (JA __).

**3.** Petitioners appealed to the Department's Judicial Officer, to whom the Secretary has delegated authority for final decisionmaking in adjudicatory proceedings. *See* 7 C.F.R. § 2.35(a). The Judicial Officer noted petitioners'

"stipulat[ion] [that] they were officers and directors of Third Coast and acted as officers and directors during the violation period." Op. 11 (JA ___) (citing Tr. 5-6, 15, 37). He noted their "significant experience in the produce industry" and knowledge of their responsibilities under PACA. Op. 9 (JA ___). And he found that "[d]espite their knowledge of Third Coast's inability to pay all produce suppliers promptly, as required by the PACA, [petitioners] continued to purchase produce from sellers until Third Coast ceased operation." Op. 11-12 (JA ___-___). The Judicial Officer observed that petitioners "demonstrated themselves to be honest and well-intentioned" and "did not personally gain from the situation in which they found themselves." Op. 12 (JA ___). Nevertheless, he found that "both Mr. Finch and Mr. Honeycutt were responsibly connected with Third Coast during the period when Third Coast violated the PACA." Op. 12-13 (JA ___-___).

The Judicial Officer rejected petitioners' attempts to rebut the presumption of responsible connection.[3] Addressing their contention that Third Coast's violations were due to the independent acts of a third party, the Judicial Officer explained that "proof of Javier Bueno's embezzlement of Third Coast's funds, by itself, is not proof by a preponderance of the evidence that [petitioners] were not actively involved in the activities that resulted in [the company's] violations of the

---

[3] The Judicial Officer also rejected several constitutional and other arguments attacking the statute more broadly. Op. 13-19 (JA ___-___).

PACA." Op. 19 (JA __). He reiterated that, despite their knowledge of Third Coast's inability to pay, petitioners continued to purchase produce until the company ceased operations. "[U]nder these circumstances, [petitioners] were actively involved in activities that resulted in Third Coast's violations of the PACA." *Ibid*.

The Judicial Officer also explained why petitioners' argument that "they were only nominal officers and directors of Third Coast *vis-a-vis* Javier Bueno's embezzlement," *ibid.*, missed the mark. Petitioners' "relationship to Javier Bueno's embezzlement, which occurred prior to Third Coast's violations of the PACA" was irrelevant to the proceedings. Op. 20 (JA __). What was at issue, and what petitioners' argument failed to address, was their "relationship to Third Coast during the period when Third Coast violated the PACA." *Ibid*.

The Judicial Officer therefore concluded that each petitioner was responsibly connected with Third Coast during the period when Third Coast willfully, flagrantly, and repeatedly violated 7 U.S.C. § 499b(4) "by virtue of his active involvement in the activities resulting in Third Coast's violations of the PACA and his status as an officer and a director of Third Coast." Op. 23 (JA __). The Judicial Officer affirmed the Director's determination and ordered that each was subject to the licensing restrictions in 7 U.S.C. § 499d(b) and the employment restrictions in 7 U.S.C. § 499h(b), effective 60 days from service of the order. Op.

23-24 (JA __-__).  On joint motion of the parties, the Judicial Officer stayed his

order pending judicial review.  AR No. 29 (JA __).

## SUMMARY OF ARGUMENT

The Perishable Agricultural Commodities Act forbids produce dealers to engage in specified unfair conduct, including the failure to make full payment promptly for produce.  7 U.S.C. § 499b(4).  Individuals found to be "responsibly connected" to dealers that flagrantly or repeatedly violate the statute are subject to temporary licensing and employment restrictions.  *Id.* §§ 499d(b), 499h(b). Petitioners' company, Third Coast, flagrantly and repeatedly violated PACA by failing to make prompt, full payment for produce purchased between February and July 2010.

The Judicial Officer's determination that petitioners were responsibly connected with Third Coast during the period of the company's violations is supported by substantial evidence and in accordance with law.  Petitioners stipulated that they were officers and directors of the company, and they failed to demonstrate that they were not actively involved in the violations.  During the period of violations, petitioners controlled the company, including its finances. But despite knowing that Third Coast could not make good on all of its obligations, petitioners continued to purchase produce.  These facts alone suffice to support the Judicial Officer's conclusion.  Although the Judicial Officer did not resolve the

case on this ground, the evidence also establishes that petitioners were not nominal officers of Third Coast.

Petitioners argue that they cannot be held responsibly connected to Third Coast because they were not involved in the embezzlement of the company's funds by its former Chief Financial Officer. As the Judicial Officer explained, evidence of this embezzlement, which took place before petitioners assumed control of the company's finances, does not establish that they were not involved in the later failure to pay. Nor is it relevant to the issue whether they were nominal officers.

Petitioners also raise a host of constitutional and other arguments why PACA is unenforceable. Many of these arguments are predicated on the erroneous beliefs that the statute imposes financial liability on individuals found to be responsibly connected to offending licensees and that it denies individuals an opportunity to prove that they were not involved in the violations. Neither is true.

Petitioners' argument that PACA violates due process has been rejected twice by this Court and by every other Circuit that has considered it. PACA's enforcement regime does not violate substantive due process because it is reasonably related to Congress's goal of regulating and facilitating interstate commerce in produce. And it does not violate procedural due process because petitioners were provided notice of the action against them and a formal hearing.

12

Petitioners' argument that PACA is a bill of attainder has also been rejected by this Court.  The statute's enforcement regime does not apply with specificity to affected persons, inflict punishment, or subject anyone to guilt without trial.  Nor is the statute unconstitutionally overbroad or an unconstitutional forfeiture of property.

## STANDARD OF REVIEW

This Court reviews final decisions in PACA cases under "the deferential standard of the Administrative Procedure Act."  *Kleiman & Hochberg*, 497 F.3d at 686 (internal quotation marks omitted).  Thus, the Court "must uphold the Judicial Officer's decision unless [it] find[s] [the decision] to be arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence."  *Ibid*. (internal quotation marks omitted).  Petitioners' constitutional claims are subject to *de novo* review.  *J.J. Cassone Bakery, Inc. v. NLRB*, 554 F.3d 1041, 1044 (D.C. Cir. 2009).

## ARGUMENT

**I.    PETITIONERS WERE RESPONSIBLY CONNECTED TO THIRD COAST DURING THE PERIOD OF VIOLATION**

**A.    The Judicial Officer's Conclusion That Petitioners Were Responsibly Connected to Third Coast Is Supported by Substantial Evidence and Consistent with Law**

Petitioners stipulated before the Chief Administrative Law Judge that they "were in fact[] officers or directors at the time of the offenses."  Tr. 5 (JA __); *see*

13

*also id.* at 15 (JA __) (confirming concession "that they [we]re in fact officers and directors").[4]   Petitioners are therefore presumed to be "responsibly connected" unless they prove by a preponderance of the evidence that they were (1) not actively involved in Third Coast's violations *and* (2) either nominal officers of Third Coast or nonowners of a licensee that was the alter ego of its owners.  *See Taylor v. U.S. Dep't of Agric.*, 636 F.3d 608, 611 (D.C. Cir. 2011).  Petitioners' evidence, however, establishes quite the opposite.

First, petitioners were actively involved in Third Coast's failure to make full payments promptly as required by PACA.[5]   By February 2010, petitioners were aware that Third Coast was having difficulties paying all of its produce suppliers, some of whom had "cut [the company] off."  Tr. 42 (JA __).  They then fired Javier Bueno and assumed his responsibilities over the company's finances.  *See*

---

[4]  Third Coast's PACA license application also lists petitioners as limited partners and holders of 32.3% ownership interests in the company.  GFRX 1, at 1, 7 (JA __, __); JHRX 1, at 1, 7 (JA __, __).

[5]  The Department of Agriculture has construed "actively involved" to mean "participat[ed] in activities resulting in a violation of the PACA . . . , unless . . . participation was limited to the performance of ministerial functions only."  *In re Norinsberg*, 58 Agric. Dec. 604, 610-11 (U.S.D.A. 1999).  Ministerial functions are those that do not involve the "exercise [of] judgment, discretion, or control with respect to the activities that resulted in a violation."  *Ibid.*  Petitioners do not challenge that interpretation, which, in any event, is entirely reasonable.  *See Perfectly Fresh Farms, Inc. v. U.S. Dep't of Agric.*, 692 F.3d 960, 971 (9th Cir. 2012); *see also Jacobson v. Dep't of Agric.*, 99 F. App'x 238, 239-40 (D.C. Cir. 2004) (upholding a determination employing the standard).

14

Tr. 74-75 (JA __-__); *see also* Op. 22 (JA __) ("In February 2010, Mr. Finch and Mr. Honeycutt removed Javier Bueno from his position with Third Coast and assumed control . . . ."). Petitioners saw themselves falling "further and further behind" on payments to PACA creditors. Tr. 69 (JA __). But despite knowing that Third Coast could not make good on all of its obligations, and understanding their responsibilities under PACA, *see* Tr. 55, 76 (JA __, __), petitioners continued to purchase produce until the company ceased operations. *See* Tr. 55, 75-76 (JA __, __-__); *see also* Op. 22 (JA __).

In light of these uncontroverted facts, the Judicial Officer's conclusion that petitioners "were actively involved in activities that resulted in Third Coast's violations of the PACA," Op. 19 (JA __), is supported, if not compelled, by substantial evidence. Indeed, this Court has previously recognized that it was

> reasonable for the agency to conclude that an individual who places orders for produce, with the knowledge that the buyer is having or will have difficulties paying for the produce, has not carried the burden of showing she was not actively involved in activities resulting in the subsequent failure to make payment promptly.

*Jacobson v. Dep't of Agric.*, 99 F. App'x 238, 239-40 (D.C. Cir. 2004); *see also Perfectly Fresh Farms, Inc. v. U.S. Dep't of Agric.*, 692 F.3d 960, 972 (9th Cir. 2012) (upholding a "responsibly connected" determination where the petitioner "continued to purchase produce despite knowing that Perfectly Fresh was unable to pay its suppliers in a timely fashion").

Furthermore, because the elements of petitioners' burden are conjunctive, their failure to prove that they were not actively involved in Third Coast's violation of PACA means that they cannot rebut the presumption created by their positions in the company. The Judicial Officer's conclusion that each petitioner "was responsibly connected with Third Coast, during the period when Third Coast violated 7 U.S.C. § 499b(4), by virtue of his active involvement in the activities resulting in Third Coast's violations of the PACA and his status as an officer and a director of Third Coast," Op. 23 (JA __), is therefore both supported by substantial evidence and in accordance with law.

Regardless, petitioners were not nominal officers of Third Coast.[6] Indeed, petitioners stipulated that not only were they officers "in fact," but "they *acted as* officers and/or directors at the time" of Third Coast's violations. Tr. 5-6 (JA __-__) (emphasis added). Their testimony reinforced this concession. From the company's founding, petitioners "did, very candidly, just about everything except for finances." Tr. 66 (JA __). And once the financial trouble started, this limitation fell away: petitioners called in an outside accounting firm to review

---

[6] Petitioners plainly do not fall within the "alter ego" exception, which applies when "the violator, although formally a corporation, is essentially an alter ego of its owners, so dominated as to negate its separate personality." *Bell v. Dep't of Agric.*, 39 F.3d 1199, 1201 (D.C. Cir. 1994) (internal quotation marks omitted). Petitioners were themselves owners, in addition to officers, of Third Coast. *See* GFRX 1, at 7 (JA __); JHRX 1, at 7 (JA __) (Third Coast's PACA application listing petitioners as each holding a 32.3% ownership interest).

16

Third Coast's books, fired the Chief Financial Officer, and took over responsibility for the company's finances. Tr. 44, 74-75 (JA __, __-__). They sold off one of the company's business lines. Tr. 56 (JA __) (describing the sale of the processing operation). They decided which creditors to pay and how much. Tr. 55 (JA __) (describing efforts to prorate payments and prioritize PACA creditors). Finch expressly admitted that he was acting as the "chief operating officer." Tr. 52 (JA __).

Individuals with such responsibilities cannot be considered "nominal," under any standard. Petitioners "had actual and significant power and authority to direct and affect company operations," *Taylor*, 636 F.3d at 615, and they did so completely for the period of Third Coast's violations. They were "actively engaged in the day-to-day operations, management *and control*" of Third Coast during the relevant period. *Kleiman & Hochberg, Inc. v. U.S. Dep't of Agric.*, 497 F.3d 681, 692 (D.C. Cir. 2007) (internal quotation marks omitted). And given their personal roles in purchasing produce despite knowledge of Third Coast's financial straits and its statutory obligations, there is "no indication that [they were] helpless pawn[s] who could not in good conscience be held accountable as . . . bona fide director[s]." *Veg-Mix, Inc. v. U.S. Dep't of Agric.*, 832 F.2d 601, 610 (D.C. Cir. 1987). Furthermore, both petitioners held 32.3% ownership stakes in the company, *see* GFRX 1, at 7 (JA __); JHRX 1, at 7 (JA __), substantially more than the 22.2%

17

found sufficient in *Martino v. U.S. Dep't of Agric.*, 801 F.2d 1410, 1414 (D.C. Cir. 1986); *see also Siegel v. Lyng*, 851 F.2d 412, 417 (D.C. Cir. 1988) ("[I]n *Martino*, this Court held that approximately twenty per cent stock ownership would suffice to make a person accountable for not controlling delinquent management.  In his capacity as President and Director, Siegel himself was the delinquent management." (citation omitted)).

## B. Petitioners' Arguments Regarding Their Connection to Javier Bueno's Embezzlement Do Not Affect the Analysis

Petitioners concede in their brief to this Court that they fall within the statutory definition of "responsibly connected."  Br. 8.  But they argue that their conduct was nonetheless "not culpable within the declared intent of the Act" because they were not involved in Javier Bueno's embezzlement, which they see as the true source of the company's legal troubles.  Br. 9.

Petitioners' focus on Javier Bueno's conduct is misplaced.  Even if, as the Judicial Officer found, "[t]his embezzlement was the proximate cause of Third Coast's serious cash shortage," Op. 19 (JA __), this does not mean that petitioners did not "participate in any activity leading to the failure to pay the produce suppliers," as they maintain, Br. 38-39.  *See* Op. 19 (JA __) ("[P]roof of Javier Bueno's embezzlement of Third Coast's funds, by itself, is not proof by a preponderance of the evidence that Mr. Finch and Mr. Honeycutt were not actively involved in the activities that resulted in Third Coast's violations of the PACA.").

18

During the period of Third Coast's violations, Javier Bueno was gone and petitioners controlled the company, including its finances. *See* Op. 12 (JA __) (finding that petitioners' "period of control of Third Coast occurred during the greatest portion of the violation period"); Br. 12-13 (acknowledging that petitioners "managed the accounts receivable" and "did oversee the payment, in whole or in part, of a multitude of PACA claimants"). Thus, it was petitioners, not Javier Bueno, who "continued to purchase produce from sellers" despite knowing that Third Coast could not make all of its payment obligations. Op. 19 (JA __); Tr. 75-76 (JA __-__). As both this Court and the Ninth Circuit have recognized, individuals who engage in such conduct fall comfortably within the definition of "responsibly connected." *See Jacobson*, 99 F. App'x at 239-40; *Perfectly Fresh Farms*, 692 F.3d at 972. Subjecting such individuals to employment restrictions is entirely consistent with PACA's intent to reach those who engage in "unreliable dealing." *Kleiman & Hochberg*, 497 F.3d at 685 (internal quotation marks omitted).

Petitioners also argue that their lack of involvement in Javier Bueno's embezzlement rendered them nominal officers of the company. *See* Br. 29. As the Judicial Officer explained, this argument misunderstands the nature of the "nominal officer" inquiry: "Mr. Finch and Mr. Honeycutt's relationship to Javier Bueno's embezzlement, which occurred prior to Third Coast's violations of the

19

PACA, is not at issue. Instead, the issue is Mr. Finch and Mr. Honeycutt's relationship *to Third Coast* during the period when Third Coast violated the PACA." Op. 20 (JA __) (emphasis added). As applied by petitioners, the "nominal officer" element of their burden would completely duplicate the "actively involved" element. *See* Br. 38 ("[W]here the officers and directors did not directly participate, benefit, or in any manner were involved in the transaction causing the default under PACA, how can they be described as anything other than 'nominal' officers or directors in those circumstances?"). This alone is reason to reject petitioners' argument. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal quotation marks omitted))

Yet even if Third Coast's violations were entirely attributable to Javier Bueno's conduct, and petitioners had no knowledge of it, that alone would not make them nominal officers. *See Taylor*, 636 F.3d at 617 ("lack of knowledge cannot save a non-nominal officer from the consequences of PACA"); *Kleiman & Hochberg*, 497 F.3d 692 (rejecting the argument that "a person cannot be responsibly connected to a violating licensee unless he either knew or should have known about the violations and then failed to take action to counteract the actions of others constituting the violations" (internal quotation marks omitted)). True

officers, directors, and substantial owners are properly held responsibly connected to a violating licensee because they are "accountable for not controlling delinquent management." *Siegel*, 851 F.2d at 417. Here, petitioners proved not only that they viewed themselves as responsible for controlling Javier Bueno, but also that they had the means to do so: as soon as they discovered his misdeeds, they fired him and assumed control of the company's finances. From that point on, petitioners unquestionably had "actual and significant power and authority to direct and affect company operations," *Taylor*, 636 F.3d at 615, in all respects, including the purchase of produce and the payment of suppliers. *See* Tr. 55, 75-76 (JA __, __-__).

Finally, petitioners complain that the Secretary, through the Judicial Officer, has "abandoned" the "nexus test" previously used to determine whether a PACA petitioner was a nominal officer of a violating licensee. *See* Br. 22. They are correct that, on remand from this Court's decision in *Taylor*, the Judicial Officer announced that he would not apply the "actual, significant nexus" test in future cases. *In re Taylor*, PACA App. Nos. 06-0008, 06-0009, 2012 WL 9511765, at *6 (U.S.D.A. Dec. 18, 2012). Rather, the "nominal [officer] inquiry" would be "limited to whether a petitioner has demonstrated by a preponderance of the evidence that he or she was merely a partner, officer, director, or shareholder 'in name only.'" *Ibid*.

21

The Judicial Officer did not, however, apply the new standard in this case, because petitioners' argument was based on the extent of their role in Javier Bueno's embezzlement, rather than the nature of their positions in Third Coast. The Judicial Officer rejected petitioners' argument as misdirected without making any determination at all whether petitioners were nominal officers, and instead relied on their mere "status" as officers and their failure to prove that they were not actively involved in the violations.  *See* Op. 23 (JA __).  For this reason, and because petitioners would fail under any standard, this case does not call for the Court to consider whether the new standard reflects a reasonable construction of PACA under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).

\*       \*       \*

"PACA 'is admittedly and intentionally a tough law.'"  *Kleiman & Hochberg*, 497 F.3d at 693 (quoting S. Rep. No. 84-2507, at 3 (1956)).  But Congress designed it this way to guard against "unreliable dealing," *id.* at 685 (internal quotation marks omitted) and to ensure that "only financially responsible persons should be engaged in the [produce-dealing] busines[s]."  *JSG Trading Corp. v. U.S. Dep't of Agric.*, 176 F.3d 536, 538 (D.C. Cir. 1999).  It may be true that petitioners did not engage in any criminal conduct, but they did repeatedly cause Third Coast to make purchases that it did not pay for.  The Judicial Officer's

22

order that they be subject to licensing and employment restrictions is consistent with both the text and the intent of the statute.

## II.    PETITIONERS' CHALLENGES TO PACA LACK MERIT

In addition to their arguments that they cannot be responsibly connected to Third Coast because they were not involved in Javier Bueno's misconduct, petitioners raise a host of more sweeping arguments that PACA is unconstitutional or otherwise unenforceable.  Most of these arguments, as petitioners acknowledge, are "predicated upon a departure from case precedent" binding on this Court.  Br. 8.  All are without merit.

### A.    Petitioners Misapprehend the Statutory Framework

Before proceeding to petitioners' individual arguments, however, it is important to clarify two important points upon which many of the arguments are built.  First, petitioners claim repeatedly that, "[a]s [a] result of the . . . determination" that they are responsibly connected to Third Coast, "PACA . . . subjects [them] to non-dischargeable personal liability for the produce debts of the corporate entity for which they were employed."  Br. 5; *see also, e.g.*, Br. 21 n.5.  This is incorrect.  Nothing in PACA requires a responsibly connected person to assume the debts of the licensee.  The Secretary has no authority to impose such liability, nor was there any attempt to do so in this case.  *See* Op. 24 (JA __)

(ordering petitioners subject to licensing and employment restrictions, but saying nothing about debts or other monetary penalties).

It appears that petitioners might have confused sanctions imposed on them by the Secretary under PACA with liability that district courts might impose on them under common-law trust principles. One of the ways PACA protects produce sellers is by requiring licensees to hold perishable commodities (and any derivative products or sales proceeds) in trust for the benefit of the seller until full payment is made. *See* 7 U.S.C. § 499e(c)(2). "As a PACA trustee, a produce buyer is charged with a duty to insure that it has sufficient assets to assure prompt payment for produce and that any beneficiary under the trust will receive full payment." *Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 705 (2d Cir. 2007) (internal quotation marks omitted). Several courts have held that individuals in a position to control the assets of a PACA trust may be held personally liable to trust beneficiaries for breach of this fiduciary duty. *See id.* at 705-06 (collecting cases). However, such "[i]ndividual liability in the PACA context is not derived from the statutory language, but from common law breach of trust principles." *Weis-Buy Servs., Inc. v. Paglia*, 411 F.3d 415, 421 (3d Cir. 2005).[7]

---

[7] Documents in the record suggest that petitioner Finch has been subjected to this type of liability. For example, a consent judgment resolving a suit by one of Third Coast's produce suppliers provides that the amount of the judgment is "expressly founded upon Principals' [i.e., Finch's and Javier Bueno's] breach of

*Continued on next page.*

Second, petitioners also claim that they were "not given an opportunity to rebut the statutory presumption" of responsible connection.  Br. 17.  They apparently believe that PACA "does not contemplate a defense that allows a person to show that even though he fits into one of the three categories, he never had enough actual authority or opportunity to be considered culpably responsibly connected."  Br. 30-31 (citing *Hawkins v. Agric. Mktg. Serv.*, 10 F.3d 1125, 1130 (5th Cir. 1993)).  This is also not true.

Before 1995, several courts of appeals (including the Fifth Circuit) had "adopted a per se rule, finding an individual responsibly connected if he fit one of the statutory categories," i.e., partner, officer, director, or substantial owner. *Norinsberg v. U.S. Dep't of Agric.*, 162 F.3d 1194, 1196 (D.C. Cir. 1998).  This Court, however, had adopted a rebuttable presumption test.  *Ibid.*  And in 1995, Congress resolved the split by amending the statute to "permit individuals who are responsibly connected . . . the opportunity to demonstrate that they were not responsible for the specific violation.."  *Id.* at 1197.  Thus, all PACA petitioners now have the opportunity to rebut the statutory presumption.  *See Taylor*, 636 F.3d at 611.  Petitioners here did, too, including during a formal hearing before the Chief Administrative Law Judge.

---

their fiduciary duties and, as such, is hereby excepted and excluded from any discharge of personal liability . . . pursuant to 11 U.S.C. § 523(a)(4)."  GFRX 9, at 4 (JA __).

### B.     PACA Does Not Violate the Due Process Clause

Petitioners argue strenuously that PACA "violates fundamental principles of due process." *See, e.g.*, Br. 9.   The argument that "literal enforcement of the 'responsibly connected' provision violates [a petitioner's] due process rights" has been rejected twice by this Court, *see Kleiman & Hochberg*, 497 F.3d at 692 n.9; *Siegel*, 851 F.2d at 416 n.12, and by all of the other Circuits that have addressed it, *see Hawkins*, 10 F.3d at 1134 (5th Cir.); *Zwick v. Freeman*, 373 F.2d 110, 118-19 (2d Cir. 1967); *Birkenfeld v. United States*, 369 F.2d 491, 494-95 (3d Cir. 1966).

To the extent that petitioners raise a substantive due process claim, it is without merit.   This Court "accord[s] economic legislation a presumption of constitutionality that can be overcome only if the challenger establishes that the legislature acted in an arbitrary and irrational way." *Ass'n of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1255 (D.C. Cir. 1998) (internal quotation marks omitted); *see also Hawkins*, 10 F.3d at 1133 (noting that courts "have . . . reviewed the constitutionality of various sections of the PACA using a 'rational basis' analysis").   Congress enacted PACA's "special sanctions against dishonest or unreliable dealing" to "help instill confidence in parties dealing with each other on short notice, across state lines and at long distances." *Veg-Mix*, 832 F.2d at 604.   The temporary employment and licensing restrictions of individuals "responsibly connected" to firms that have engaged in flagrant or repeated

26

violations of the statute are plainly reasonable means of achieving that goal. *See, e.g.*, *Zwick*, 373 F.2d at 118. Any substantive due process claim premised on the award of punitive damages, Br. 18-20, fails because there was no award of damages, punitive or otherwise. *See supra* Part II.A.

To the extent that petitioners' claim is that they were owed more process before being subjected to PACA's employment and licensing restrictions, it is equally flawed. Even if petitioners have been deprived of a protected interest in liberty,[8] the "essential principle of due process" is that the deprivation "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Kuretski v. Commissioner*, 755 F.3d 929, 945 (D.C. Cir. 2014) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)).

Petitioners received both here. As the Judicial Officer explained, they received notice of the Department's initial "responsibly connected" determination, and they sought review of that determination before the Director, the Department's Chief Administrative Law Judge, and its Judicial Officer. Petitioners submitted

---

[8] Whether this is true is highly questionable. While some Supreme Court cases have suggested the existence of "some generalized due process right to choose one's field of private employment," that right is "nevertheless subject to reasonable government regulation," and "[t]hese cases all deal with a complete prohibition of the right to engage in a calling." *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999). Because the question need not be resolved to decide petitioners' claims, we may assume for the purposes of argument that petitioners have been deprived of a cognizable liberty interest.

written materials at each level of review and received a formal hearing before the Chief Administrative Law Judge, at which they offered testimony, documentary evidence, and legal argument, and also cross-examined the witness against them. *See* Op. 16 (JA __).  Their protestations to the contrary notwithstanding, petitioners in fact received an administrative "trial as to their involvement in the subject transaction(s)."  Br. 24.  They have neither identified what additional procedures they seek, *see Doe v. District of Columbia*, 93 F.3d 861, 870 (D.C. Cir. 1996) ("[A] procedural due process claim requires the plaintiff to identify the process that is due."), nor explained why such procedures are required in these circumstances, *see Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 317 (D.C. Cir. 2014) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands." (internal quotation marks omitted)).

## C.    PACA Is Not a Bill of Attainder

Petitioners open their argument by conceding that "[t]here is no question that this Court has previously held that the penalty provisions of PACA do not infringe the rights granted by the Bill of Attainder clause of the Constitution."  Br. 13. Indeed, in *Siegel v. Lyng*, 851 F.2d at 416, this Court expressly held that PACA's employment bar "does not infringe the Bill of Attainder Clause."  *See also Zwick*, 373 F.2d at 119-20 (same).

"To constitute a bill of attainder, a statute must: (1) apply with specificity to affected persons; (2) impose punishment; and (3) assign guilt without a judicial trial." *Hettinga v. United States*, 677 F.3d 471, 477 (D.C. Cir. 2012). A statute must meet all elements to be a bill of attainder, *see id.* at 478; PACA's enforcement scheme meets none. First, the definition of "responsibly connected" neither designates individuals by name nor makes them "easily ascertainable" by describing them in terms of past conduct. *Id.* at 477. "A statute with open-ended applicability . . . does not single out a particular person or group for punishment." *Ibid.*

Second, as this Court held in *Siegel*, PACA "does not inflict 'punishment' forbidden by the Bill of Attainder Clause, but rather is a statutory civil penalty to assist regulatory enforcement of the Act." 851 F.2d at 417-18. Even if the temporary restrictions superficially resemble the employment bars considered by the Supreme Court to constitute punishment, *see, e.g.*, *United States v. Lovett*, 328 U.S. 303, 315-16 (1946), they neither target "those legislatively branded as disloyal" nor "violat[e] the fundamental guarantees of political and religious freedom." *BellSouth Corp. v. FCC*, 162 F.3d 678, 686 (D.C. Cir. 1998). More importantly, *see id.* at 684, the PACA sanctions reasonably further nonpunitive legislative purposes: the "resolve to guarantee that PACA transactions by firms employing persons 'responsibly connected' to disciplined licensees be conducted

with easy-to-monitor, scrupulous compliance with the ACT is ample justification"
for the temporary restrictions. *Siegel*, 851 F.2d at 418. And petitioners have
pointed to no evidence at all of a legislative intent to punish. *See Flemming v.
Nestor*, 363 U.S. 603, 627 (1960) (explaining that "only the clearest proof could
suffice to establish the unconstitutionality of a statute" on the basis of
impermissible congressional motive).

Third, PACA does not assign guilt without a trial. "The command of the
Bill of Attainder Clause" is "that a legislature can provide that persons possessing
certain characteristics must abstain from certain activities, but must leave to other
tribunals the task of deciding who possesses those characteristics." *United States
v. Brown*, 381 U.S. 437, 454 n.29 (1965). That is precisely what Congress did
through PACA: it identified the characteristics of persons subject to employment
and licensing restrictions (i.e., those responsibly connected with flagrant and
repeated violators) and left to the Department, with judicial review in an Article III
court, to determine who qualifies.

Petitioners provide no persuasive reason for this Court to abandon its
holding in *Siegel*. There is no "conflict," Br. 14, with the Supreme Court's
decision in *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), which was
decided *before Siegel* and addressed the question whether a municipality may be
held liable for punitive damages under 42 U.S.C. § 1983. Even if the licensing and

employment restrictions in PACA could be described as "punitive" in some general sense, that does not mean that they constitute punishment for the purposes of the Bill of Attainder Clause. *See Johnson v. SEC*, 87 F.3d 484, 491 (D.C. Cir. 1996) (noting that whether a license suspension is a penalty for purposes of 28 U.S.C. § 2462 is a distinct question from whether it constitutes "punishment in various *constitutional* contexts"). Further, although it is not necessary to save PACA from a Bill of Attainder challenge, petitioners *were* provided "an opportunity to rebut the statutory presumption." Br. 17; *see supra* Part II.A. They were found responsibly connected to Third Coast because they had failed to provide "proof of a lack of involvement . . . [in] any PACA violations taking place," Br. 17, not because they were denied the opportunity to do so.

### D.    Petitioners' Remaining Arguments Are Without Merit

**1.** Petitioners argue that PACA is "unconstitutionally overbroad" because it "penalizes virtuous non-culpable conduct as if it were the contrary." Br. 26. As an initial matter, the conduct in which petitioners were involved (i.e., purchasing produce without the ability to pay) is precisely the conduct at which the statute is aimed. *See JSG Trading Corp.*, 176 F.3d at 538. Regardless, to the extent that this is an independent argument and not part of their due process claim, petitioners' "overbreadth challenge must fail because there is simply no doctrine that requires that, when the legislature enacts a statute that does not reach substantial

31

constitutionally protected conduct, it must tailor the statute narrowly to accomplish the goals it intends to reach." *Electrolert Corp. v. Barry*, 737 F.2d 110, 114 (D.C. Cir. 1984).    Petitioners make no attempt to argue that PACA "reaches a 'substantial' amount of protected free speech, judged in relation to [its] plainly legitimate sweep.'" *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 456 (D.C. Cir. 2012) (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)); *see also Bama Tomato Co. v. U.S. Dep't of Agric.*, 112 F.3d 1542 (11th Cir. 1997 ) (rejecting a First Amendment overbreadth challenge to PACA).

**2.**    Petitioners argue that PACA is inconsistent with the "procedure and process" provided by civil forfeiture statutes.  Br. 13, 23.  The Judicial Officer rejected this argument as well, explaining that the statutes "are not applicable to the licensing restrictions in 7 U.S.C. § 499d(b) or the employment restrictions in 7 U.S.C. § 499h(b)."  Op. 17 (JA __).  Petitioners offer no reason why this conclusion was erroneous.  On the contrary, they concede that the forfeiture statutes do "not contemplat[e]" application to PACA proceedings.  Br. 23.  To the extent that petitioners intend to argue that adherence to certain procedures utilized in forfeiture proceedings is constitutionally required for PACA proceedings as well, any such obligation would stem from the Due Process Clause, not the forfeiture statutes themselves.  But as explained above, petitioners have already received all of the process due to them.

32

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

JOYCE R. BRANDA
  *Acting Assistant Attorney General*

MICHAEL S. RAAB
THOMAS PULHAM

 /s/ Thomas Pulham
THOMAS PULHAM
  *(202) 514-4332*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7323*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

JANUARY 2015

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,672 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1), according to the count of Microsoft Word.

I further certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

 /s/ Thomas Pulham
THOMAS PULHAM

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2015, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  I further certify that I will cause five paper copies of this brief to be filed with the Court within three business days.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

 /s/ Thomas Pulham
THOMAS PULHAM

# ADDENDUM

7 U.S.C. § 499a ................................................................................. ADD-1

7 U.S.C. § 499b ................................................................................. ADD-4

7 U.S.C. § 499c ................................................................................. ADD-5

7 U.S.C. § 499d ................................................................................. ADD-8

7 U.S.C. § 499e ............................................................................... ADD-10

7 U.S.C. § 499h ............................................................................... ADD-12

CODIFICATION

Section constitutes part of section 3 of act Mar. 3, 1927. Remainder of section 3 is classified to sections 495 and 496 of this title.

## § 495. Authorization of appropriations

There is authorized to be appropriated, out of any moneys in the Treasury not otherwise appropriated, such sums as may be necessary after the fiscal year beginning July 1, 1927, to carry out the purposes of this chapter.

(Mar. 3, 1927, ch. 309, §3, 44 Stat. 1355.)

CODIFICATION

Section constitutes part of section 3 of act Mar. 3, 1927. Remainder of section 3 is classified to sections 494 and 496 of this title.

## § 496. Validity of other statutes dealing with same subject

This chapter shall not abrogate nor nullify any other statute, whether State or Federal, dealing with the same subjects as this chapter, but it is intended that all such statutes shall remain in full force and effect, except insofar only as they are inconsistent herewith or repugnant hereto.

(Mar. 3, 1927, ch. 309, §3, 44 Stat. 1355.)

CODIFICATION

Section constitutes part of section 3 of act Mar. 3, 1927. Remainder of section 3 is classified to sections 494 and 495 of this title.

## § 497. Separability

If any provision of this chapter is declared unconstitutional or the applicability thereof to any person or circumstance is held invalid, the validity of the remainder of the chapter and the applicability of such provisions to other persons and circumstances shall not be affected thereby.

(Mar. 3, 1927, ch. 309, §4, 44 Stat. 1356.)

## CHAPTER 20A—PERISHABLE AGRICULTURAL COMMODITIES

Sec.
499a.    Short title and definitions.
499b.    Unfair conduct.
499b–1.  Products produced in distinct geographic areas.
499c.    Licenses.
499d.    Issuance of license.
499e.    Liability to persons injured.
499f.    Complaints, written notifications, and investigations.
499g.    Reparation order.
499h.    Grounds for suspension or revocation of license.
499i.    Accounts, records, and memoranda; duty of licensees to keep; contents; suspension of license for violation of duty.
499j.    Orders; effective date; continuance in force; suspension, modification and setting aside; penalty.
499k.    Injunctions; application of injunction laws governing orders of Interstate Commerce Commission.
499l.    Violations; report to Attorney General; proceedings; costs.
499m.    Complaints; procedure, penalties, etc.
499n.    Inspection of perishable agricultural commodities.

Sec.
499o.    Rules, regulations, and orders; appointment, removal, and compensation of officers and employees; expenditures; authorization of appropriations; abrogation of inconsistent statutes.
499p.    Liability of licensees for acts and omissions of agents.
499q.    Separability.
499r.    Repealed.
499s.    Depositing appropriations in fund.
499t.    Omitted.

## § 499a. Short title and definitions

### (a) Short title

This chapter may be cited as the "Perishable Agricultural Commodities Act, 1930".

### (b) Definitions

For purposes of this chapter:

(1) The term "person" includes individuals, partnerships, corporations, and associations.

(2) The term "Secretary" means the Secretary of Agriculture.

(3) The term "interstate or foreign commerce" means commerce between any State or Territory, or the District of Columbia and any place outside thereof; or between points within the same State or Territory, or the District of Columbia but through any place outside thereof; or within the District of Columbia.

(4) The term "perishable agricultural commodity"—

(A) Means any of the following, whether or not frozen or packed in ice: Fresh fruits and fresh vegetables of every kind and character; and

(B) Includes cherries in brine as defined by the Secretary in accordance with trade usages.

(5) The term "commission merchant" means any person engaged in the business of receiving in interstate or foreign commerce any perishable agricultural commodity for sale, on commission, or for or on behalf of another.

(6) The term "dealer" means any person engaged in the business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary, any perishable agricultural commodity in interstate or foreign commerce, except that (A) no producer shall be considered as a "dealer" in respect to sales of any such commodity of his own raising; (B) no person buying any such commodity solely for sale at retail shall be considered as a "dealer" until the invoice cost of his purchases of perishable agricultural commodities in any calendar year are in excess of $230,000; and (C) no person buying any commodity other than potatoes for canning and/or processing within the State where grown shall be considered a "dealer" whether or not the canned or processed product is to be shipped in interstate or foreign commerce, unless such product is frozen or packed in ice, or consists of cherries in brine, within the meaning of paragraph (4) of this section. Any person not considered as a "dealer" under clauses (A), (B), and (C) may elect to secure a license under the provisions of section 499c of this title, and in such case and while the license is in effect such person shall be considered as a "dealer".

(7) The term "broker" means any person engaged in the business of negotiating sales and purchases of any perishable agricultural commodity in interstate or foreign commerce for or on behalf of the vendor or the purchaser, respectively, except that no person shall be deemed to be a "broker" if such person is an independent agent negotiating sales for and on behalf of the vendor and if the only sales of such commodities negotiated by such person are sales of frozen fruits and vegetables having an invoice value not in excess of $230,000 in any calendar year.

(8) A transaction in respect of any perishable agricultural commodity shall be considered in interstate or foreign commerce if such commodity is part of that current of commerce usual in the trade in that commodity whereby such commodity and/or the products of such commodity are sent from one State with the expectation that they will end their transit, after purchase, in another, including, in addition to cases within the above general description, all cases where sale is either for shipment to another State, or for processing within the State and the shipment outside the State of the products resulting from such processing. Commodities normally in such current of commerce shall not be considered out of such commerce through resort being had to any means or device intended to remove transactions in respect thereto from the provisions of this chapter.

(9) The term "responsibly connected" means affiliated or connected with a commission merchant, dealer, or broker as (A) partner in a partnership, or (B) officer, director, or holder of more than 10 per centum of the outstanding stock of a corporation or association. A person shall not be deemed to be responsibly connected if the person demonstrates by a preponderance of the evidence that the person was not actively involved in the activities resulting in a violation of this chapter and that the person either was only nominally a partner, officer, director, or shareholder of a violating licensee or entity subject to license or was not an owner of a violating licensee or entity subject to license which was the alter ego of its owners.

(10) The terms "employ" and "employment" mean any affiliation of any person with the business operations of a licensee, with or without compensation, including ownership or self-employment.

(11) The term "retailer" means a person that is a dealer engaged in the business of selling any perishable agricultural commodity at retail.

(12) The term "grocery wholesaler" means a person that is a dealer primarily engaged in the full-line wholesale distribution and resale of grocery and related nonfood items (such as perishable agricultural commodities, dry groceries, general merchandise, meat, poultry, and seafood, and health and beauty care items) to retailers. However, such term does not include a person described in the preceding sentence if the person is primarily engaged in the wholesale distribution and resale of perishable agricultural commodities rather than other grocery and related nonfood items.

(13) The term "collateral fees and expenses" means any promotional allowances, rebates, service or materials fees paid or provided, directly or indirectly, in connection with the distribution or marketing of any perishable agricultural commodity.

(June 10, 1930, ch. 436, §1, 46 Stat. 531; Apr. 13, 1934, ch. 120, §1, 48 Stat. 584; Aug. 20, 1937, ch. 719, §1, 50 Stat. 725; June 29, 1940, ch. 456, §§1, 2, 54 Stat. 696; Pub. L. 87–725, §§1, 2, Oct. 1, 1962, 76 Stat. 673; Pub. L. 91–107, §§1, 2, Nov. 4, 1969, 83 Stat. 182; Pub. L. 95–562, §1, Nov. 1, 1978, 92 Stat. 2381; Pub. L. 97–98, title XI, §1115(a), Dec. 22, 1981, 95 Stat. 1269; Pub. L. 102–237, title X, §1011(1), Dec. 13, 1991, 105 Stat. 1898; Pub. L. 104–48, §§2, 9(a), 12(a), Nov. 15, 1995, 109 Stat. 424, 429, 430.)

CODIFICATION

Section was formerly classified to section 551 of this title.

AMENDMENTS

1995—Subsec. (b)(9). Pub. L. 104–48, §12(a), inserted at end "A person shall not be deemed to be responsibly connected if the person demonstrates by a preponderance of the evidence that the person was not actively involved in the activities resulting in a violation of this chapter and that the person either was only nominally a partner, officer, director, or shareholder of a violating licensee or entity subject to license or was not an owner of a violating licensee or entity subject to license which was the alter ego of its owners."

Subsec. (b)(11), (12). Pub. L. 104–48, §2, added pars. (11) and (12).

Subsec. (b)(13). Pub. L. 104–48, §9(a), added par. (13).

1991—Pub. L. 102–237 inserted section catchline, added subsec. (a), designated existing provisions as subsec. (b), and in subsec. (b), inserted heading, substituted "For purposes of this chapter:" for "When used in this chapter—" and periods for semicolons at the end of pars. (1) to (6) and (9).

1981—Pars. (6), (7). Pub. L. 97–98 substituted "$230,000" for "$200,000".

1978—Par. (6)(B). Pub. L. 95–562, §1(a)(1), substituted "$200,000" for "$100,000".

Par. (6)(C). Pub. L. 95–562, §1(b), inserted "other than potatoes" after "commodity".

Par. (7). Pub. L. 95–562, §1(a)(2), substituted "$200,000" for "$100,000".

1969—Par. (6)(B). Pub. L. 91–107, §1, substituted "$100,000" for "$90,000".

Par. (7). Pub. L. 91–107, §2, substituted "$100,000" for "$90,000".

1962—Par. (6). Pub. L. 87–725, §1, substituted "wholesale or jobbing quantities" for "carloads", the requirement that the dealer's invoice cost of his purchases in any calendar year exceed $90,000 for the requirement that his purchases in such year exceed 20 carloads, and struck out definition of "in carloads".

Par. (7). Pub. L. 87–725, §1, excluded from definition of "broker", persons who are independent agents negotiating sales for vendors and whose sales are of frozen fruits and vegetables having an invoice value not exceeding $90,000 in any calendar year.

Pars. (9), (10). Pub. L. 87–725, §2, added pars. (9) and (10).

1940—Par. (4). Act June 29, 1940, §1, designated existing provisions as cl. (A) and added cl. (B).

Par. (6)(C). Act June 29, 1940, §2, inserted ", or consists of cherries in brine," after "ice".

1937—Par. (6)(C). Act Aug. 20, 1937, inserted "unless such product is frozen or packed in ice within the meaning of paragraph 4 of this section" after "foreign commerce".

1934—Par. (6)(C). Act Apr. 13, 1934, added cl. (C).

EFFECTIVE DATE OF 1981 AMENDMENT

Amendment by Pub. L. 97–98 effective Dec. 22, 1981, see section 1801 of Pub. L. 97–98, set out as an Effective Date note under section 4301 of this title.

EFFECTIVE DATE OF 1978 AMENDMENT

Pub. L. 95–562, §1(a), Nov. 1, 1978, 92 Stat. 2381, provided that the amendment made by section 1(a) of Pub. L. 95–562 is effective Jan. 1, 1979.

SHORT TITLE OF 1995 AMENDMENT

Pub. L. 104–48, §1(a), Nov. 15, 1995, 109 Stat. 424, provided that: ''This Act [amending this section and sections 499b, 499c to 499f, and 499h of this title and repealing provisions set out as a note under section 499f of this title] may be cited as the 'Perishable Agricultural Commodities Act Amendments of 1995'.''

STUDY OF DOMESTIC FRUIT AND VEGETABLE INDUSTRY

Pub. L. 101–624, title XIII, §§1301–1305, Nov. 28, 1990, 104 Stat. 3559, 3560, provided that:

''SEC. 1301. FINDINGS.

''Congress finds that—

''(1) fruits, vegetables, and specialty crops are a vital and important source of nutrition for the general health and welfare of the people of the United States; and

''(2) fruits and vegetables are recommended as an essential part of a healthy, nutritious diet by numerous health officials and organizations including the Surgeon General of the United States; the National Institutes of Health; the National Cancer Institute; the American Heart Association; the Committee on Diet, Nutrition and Cancer of the National Academy of Sciences; the Department of Agriculture; and the Department of Health and Human Services.

''SEC. 1302. PURPOSES.

''The purposes of this subtitle [subtitle A (§§1301–1309) of Pub. L. 101–624, enacting section 499b–1 of this title, amending sections 608c and 608e–1 of this title, and enacting this note] are to—

''(1) improve the Nation's dietary and nutritional standards by promoting domestically produced wholesome and nutritious fruit and vegetable products;

''(2) increase the public awareness as to the difficulties domestic producers experience regarding the production, harvesting, and marketing of these products; and

''(3) aid in the development of new technology and techniques that will assist domestic producers in meeting the challenges of increased demands for fruit and vegetable products in the future.

''SEC. 1303. DECLARATION.

''Congress declares that the domestic production of fruits and vegetables is an integral part of this Nation's farm policy.

''SEC. 1304. STUDY OF THE FRUIT AND VEGETABLE INDUSTRY.

''(a) STUDY.—

''(1) IN GENERAL.—The Secretary of Agriculture shall conduct a study to determine the state of the domestic fruit and vegetable industry. In conducting such study, the Secretary of Agriculture shall consult with such agencies or departments, as determined necessary by the Secretary of Agriculture, including the Environmental Protection Agency, the Department of Health and Human Services, the Department of Commerce, the Department of Labor, and the Department of Education.

''(2) CONTENTS.—The study conducted under paragraph (1) shall include—

''(A) a review of the availability of an adequate labor supply for maintaining and harvesting of fruits and vegetables;

''(B) a review of the availability of crop insurance or disaster assistance for fruit and vegetable producers;

''(C) a review of scientific and technological advances in the areas of genetics, biotechnology, integrated pest management, post harvest protection, and other scientific developments related to the production and marketing of fruits and vegetables;

''(D) an examination of the availability of safe and effective chemicals for use in the production of fruits and vegetables, and an evaluation of the value of national uniformity to both consumers and producers;

''(E) a review of the requirements and cost of labeling fruits and vegetables in the industry, and the benefits that would result from the labeling of such products; and

''(F) a review of Federal educational programs that teach the importance of fruits and vegetables to a proper diet.

''(b) REPORT.—Not later than 18 months after the date of enactment of this title [Nov. 28, 1990], the Secretary of Agriculture shall prepare and submit, to the Committee on Agriculture of the House of Representatives and the Committee on Agriculture, Nutrition, and Forestry of the Senate, a report containing the results of the study described in subsection (a). Such report shall include—

''(1) the recommendations of the Secretary concerning the manner in which producers of domestic fruit and vegetable commodities that are not receiving assistance under the programs that provide market enhancement assistance (such as the export enhancement program under subtitle B of title XI of the Food Security Act of 1985 (7 U.S.C. 1736p et seq.) to producers of domestic fruit and vegetable commodities, could participate in such programs; and

''(2) the recommendations to the Secretary concerning the establishment of additional programs of the type described in paragraph (1) to assist producers of domestic fruit and vegetable commodities in increasing their production and in expanding domestic and foreign markets for the products of such producers.

''SEC. 1305. COUNTRY OF ORIGIN LABELING PROGRAMS.

''(a) GROWN IN THE U.S. PROGRAM.—The Secretary of Agriculture (hereafter referred to in this section as the 'Secretary') shall implement a program defining the conditions under which non-perishable agricultural products may be designated as 'grown in the U.S.'.

''(b) PILOT PROGRAM.—

''(1) IN GENERAL.—The Secretary shall implement a 2-year pilot program during which time perishable agricultural products (fresh fruits and vegetables) are labeled or marked as to their country of origin. This program shall be conducted nationwide. After the 2-year period, the Secretary shall conduct a study to determine the results of the program. The Secretary shall submit to the Congress the results of the study within 18 months from the date of completion of the program.

''(2) DETAILS OF THE PILOT PROGRAM.—

''(A) DESIGNATION OF COUNTRY OF ORIGIN.—The program shall require that the country of origin of perishable agricultural products be indicated on any such products or on the package, display, holding unit, or bin by means of a label, stamp, mark, placard, or other clear and visible indication at the point of sale by any commission merchant, dealer, broker, or grocer. A sign near the products shall be an acceptable indication of the country of origin.

''(B) APPLICATION OF PROGRAM.—

''(i) IMPORTED AND DOMESTIC PRODUCTS.—The program shall apply to imported and domestic perishable agricultural products (including fresh fruits and vegetables).

''(ii) IMPORTED PERISHABLE AGRICULTURAL PRODUCTS.—The labeling program shall apply to imported perishable agricultural products that enter the United States marked as to the country of origin and that are in compliance with section 304(a) of the Tariff Act of 1930 [19 U.S.C. 1304(a)].

ADD-3

"(C) EXEMPTIONS.—The Secretary may provide for exemptions for products that are exempted, under section 304(a)(3)(J) of the Tariff Act of 1930, from the country of origin marking requirements of that Act [19 U.S.C. 1202 et seq.].

"(c) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated such sums as are necessary to carry out this section."

### POTATO DEALERS

Pub. L. 95–562, §1(b), Nov. 1, 1978, 92 Stat. 2381, provided in part that no person buying potatoes for processing solely within the State where grown shall be deemed or considered to be a dealer under par. (6) of this section, as amended by section 1(b) of Pub. L. 95–562, until Jan. 1, 1982.

## § 499b. Unfair conduct

It shall be unlawful in or in connection with any transaction in interstate or foreign commerce:

(1) For any commission merchant, dealer, or broker to engage in or use any unfair, unreasonable, discriminatory, or deceptive practice in connection with the weighing, counting, or in any way determining the quantity of any perishable agricultural commodity received, bought, sold, shipped, or handled in interstate or foreign commerce.

(2) For any dealer to reject or fail to deliver in accordance with the terms of the contract without reasonable cause any perishable agricultural commodity bought or sold or contracted to be bought, sold, or consigned in interstate or foreign commerce by such dealer.

(3) For any commission merchant to discard, dump, or destroy without reasonable cause, any perishable agricultural commodity received by such commission merchant in interstate or foreign commerce.

(4) For any commission merchant, dealer, or broker to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction involving any perishable agricultural commodity which is received in interstate or foreign commerce by such commission merchant, or bought or sold, or contracted to be bought, sold, or consigned, in such commerce by such dealer, or the purchase or sale of which in such commerce is negotiated by such broker; or to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had; or to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction; or to fail to maintain the trust as required under section 499e(c) of this title. However, this paragraph shall not be considered to make the good faith offer, solicitation, payment, or receipt of collateral fees and expenses, in and of itself, unlawful under this chapter.

(5) For any commission merchant, dealer, or broker to misrepresent by word, act, mark, stencil, label, statement, or deed, the character, kind, grade, quality, quantity, size, pack, weight, condition, degree of maturity, or State, country, or region of origin of any perishable agricultural commodity received, shipped, sold, or offered to be sold in interstate or foreign commerce. However, any commission merchant, dealer, or broker who has violated—

(A) any provision of this paragraph may, with the consent of the Secretary, admit the violation or violations; or

(B) any provision of this paragraph relating to a misrepresentation by mark, stencil, or label shall be permitted by the Secretary to admit the violation or violations if such violation or violations are not repeated or flagrant;

and pay, in the case of a violation under either clause (A) or (B) of this paragraph, a monetary penalty not to exceed $2,000 in lieu of a formal proceeding for the suspension or revocation of license, any payment so made to be deposited into the Treasury of the United States as miscellaneous receipts. A person other than the first licensee handling misbranded perishable agricultural commodities shall not be held liable for a violation of this paragraph by reason of the conduct of another if the person did not have knowledge of the violation or lacked the ability to correct the violation.

(6) For any commission merchant, dealer, or broker, for a fraudulent purpose, to remove, alter, or tamper with any card, stencil, stamp, tag, or other notice placed upon any container or railroad car containing any perishable agricultural commodity, if such card, stencil, stamp, tag, or other notice contains a certificate or statement under authority of any Federal or State inspector or in compliance with any Federal or State law or regulation as to the grade or quality of the commodity contained in such container or railroad car or the State or country in which such commodity was produced.

(7) For any commission merchant, dealer, or broker, without the consent of an inspector, to make, cause, or permit to be made any change by way of substitution or otherwise in the contents of a load or lot of any perishable agricultural commodity after it has been officially inspected for grading and certification, but this shall not prohibit re-sorting and discarding inferior produce.

(June 10, 1930, ch. 436, §2, 46 Stat. 532; Apr. 13, 1934, ch. 120, §§2, 3, 48 Stat. 585; June 19, 1936, ch. 602, §1, 49 Stat. 1533; Aug. 20, 1937, ch. 719, §§2–4, 50 Stat. 725, 726; June 29, 1940, ch. 456, §§3, 4, 54 Stat. 696; Apr. 6, 1942, ch. 211, 56 Stat. 200; July 30, 1956, ch. 786, §1, 70 Stat. 726; Pub. L. 93–369, Aug. 10, 1974, 88 Stat. 423; Pub. L. 97–352, §1, Oct. 18, 1982, 96 Stat. 1667; Pub. L. 98–273, §2, May 7, 1984, 98 Stat. 166; Pub. L. 104–48, §§9(b), 10, Nov. 15, 1995, 109 Stat. 430.)

### CODIFICATION

Section was formerly classified to section 552 of this title.

### AMENDMENTS

1995—Pub. L. 104–48, §9(b)(1), substituted "commerce:" for "commerce—" in introductory provisions.

Pars. (1) to (3). Pub. L. 104–48, §9(b)(2), substituted period for semicolon at end.

Par. (4). Pub. L. 104–48, §9(b)(2), (3), substituted period for semicolon after "section 499e(c) of this title" and inserted at end "However, this paragraph shall not be considered to make the good faith offer, solicitation, payment, or receipt of collateral fees and expenses, in and of itself, unlawful under this chapter."

Par. (5). Pub. L. 104–48, §§9(b)(2), 10, substituted ''foreign commerce. However,'' for ''foreign commerce: *Provided,* That'', substituted period for semicolon after ''miscellaneous receipts'', and inserted at end ''A person other than the first licensee handling misbranded perishable agricultural commodities shall not be held liable for a violation of this paragraph by reason of the conduct of another if the person did not have knowledge of the violation or lacked the ability to correct the violation.''

Par. (6). Pub. L. 104–48, §9(b)(2), substituted period for semicolon at end.

1984—Par. (4). Pub. L. 98–273 inserted ''or to fail to maintain the trust as required under section 499e(c) of this title;''.

1982—Par. (5). Pub. L. 97–352 substituted ''*Provided,* That any commission merchant, dealer, or broker who has violated (A) any provision of this paragraph may, with the consent of the Secretary, admit the violation or violations; or (B) any provision of this paragraph relating to a misrepresentation by mark, stencil, or label shall be permitted by the Secretary to admit the violation or violations if such violation or violations are not repeated or flagrant; and pay, in the case of a violation under either clause (A) or (B) of this paragraph,'' for ''*Provided,* That any commission merchant, dealer, or broker who has violated this paragraph may, with the consent of the Secretary, admit the violation or violations and pay''.

1974—Par. (5). Pub. L. 93–369 inserted proviso for consent admission of violations, payment of monetary penalty not in excess of $2,000 in lieu of formal proceedings for suspension or revocation of license, and for deposit of the payments into the Treasury of the United States as miscellaneous receipts.

1956—Par. (5). Act July 30, 1956, struck out ''for a fraudulent purpose'' after ''broker'', and included misrepresentation of region of origin.

1942—Par. (4). Act Apr. 6, 1942, inserted ''and make full payment'' and ''or to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction''.

1940—Par. (1). Act June 29, 1940, §3, among other changes, inserted ''dealer'' after ''merchant''.

Par. (5). Act June 29, 1940, inserted ''quantity, size, pack, weight'' after ''quality''.

1937—Par. (5). Act Aug. 20, 1937, §2, among other changes, inserted ''mark, stencil, label, statement'' after ''act'' and ''the character, kind, grade, quality, condition, degree of maturity'' after ''or deed''.

Par. (6). Act Aug. 20, 1937, §3, inserted ''or in compliance with any Federal or State law or regulation'' after ''inspector''.

Par. (7). Act Aug. 20, 1937, §4, added par. (7).

1936—Par. (4). Act June 17, 1936, struck out ''or concerning the condition of the market for'' after ''involving''.

1934—Par. (2). Act Apr. 13, 1934, §2, inserted ''or consigned'' after ''sold''.

Par. (4). Act Apr. 13, 1934, §3, substituted ''in connection with any transaction involving or concerning'' for ''concerning the condition, quality, quantity or disposition of'' and inserted ''or consigned'' after ''contracted to be bought or sold''.

## § 499b–1. Products produced in distinct geographic areas

### (a) In general

In the case of a perishable agricultural commodity (as defined under the Perishable Agricultural Commodity Act (7 U.S.C. 499a(4))—[1]

(1) subject to a Federal marketing order under the Agricultural Marketing Agreement Act of 1937 (7 U.S.C. 601 et seq.);

(2) traditionally identified as being produced in a distinct geographic area, State, or region; and

(3) the unique identity, based on such distinct geographic area, of which has been promoted with funds collected through producer contributions pursuant to such marketing order,

no person may use the unique name or geographical designation of such commodity to promote the sale of a similar commodity produced outside such area, State, or region.

### (b) Penalties

A violation of this section shall be considered a violation of paragraphs (4) and (5) of section 2 of the Perishable Agricultural Commodities Act (7 U.S.C. 499b(4) and (5)).

### (c) Reimbursement

A person bringing a complaint under this section shall reimburse the Secretary of Agriculture for any and all costs associated with the enforcement of this section.

### (d) Prohibition

The Secretary of Agriculture shall not increase any fees charged under the Perishable Agricultural Commodities Act [7 U.S.C. 499a et seq.] to offset costs associated with the operation of this section.

### (e) Regulations

The Secretary shall promulgate regulations to carry out this section.

(Pub. L. 101–624, title XIII, §1309, Nov. 28, 1990, 104 Stat. 3562.)

REFERENCES IN TEXT

The Perishable Agricultural Commodity Act, and the Perishable Agricultural Commodities Act, referred to in subsecs. (a), (b), and (d), probably mean the Perishable Agricultural Commodities Act, 1930, act June 10, 1930, ch. 436, 46 Stat. 531, as amended, which is classified generally to this chapter (§499a et seq.). For complete classification of this Act to the Code, see section 499a(a) of this title and Tables.

7 U.S.C. 499a(4), referred to in subsec. (a), was redesignated 7 U.S.C. 499a(b)(4) by Pub. L. 102–237, title X, §1011(1)(A), Dec. 13, 1991, 105 Stat. 1898.

The Agricultural Marketing Agreement Act of 1937 (7 U.S.C. 601 et seq.), referred to in subsec. (a)(1), is act June 3, 1937, ch. 296, 50 Stat. 246, as amended, which is classified principally to chapter 26A (§671 et seq.) of this title. For complete classification of this Act to the Code, see section 674 of this title and Tables. The Agricultural Marketing Agreement Act of 1937 reenacted and amended the Agricultural Adjustment Act, title I of act May 12, 1933, ch. 25, 48 Stat. 31, as amended, which is classified generally to chapter 26 (§601 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 601 of this title and Tables.

CODIFICATION

Section was enacted as part of the Food, Agriculture, Conservation, and Trade Act of 1990, and not as part of the Perishable Agricultural Commodities Act, 1930 which comprises this chapter.

## § 499c. Licenses

### (a) License required; penalties for violations

After December 10, 1930, no person shall at any time carry on the business of a commission mer-

[1] See References in Text note below.

chant, dealer, or broker without a license valid and effective at such time. Any person who violates any provision of this subsection shall be liable to a penalty of not more than $1,000 for each such offense and not more than $250 for each day it continues, which shall accrue to the United States and may be recovered in a civil suit brought by the United States.

Any person violating this provision may, upon a showing satisfactory to the Secretary of Agriculture, or his authorized representative, that such violation was not willful but was due to inadvertence, be permitted by the Secretary, or such representative, to settle his liability in the matter by the payment of the fees due for the period covered by such violation and an additional sum, not in excess of $250, to be fixed by the Secretary of Agriculture or his authorized representative. Such payment shall be deposited in the Treasury of the United States in the same manner as regular license fees.

**(b) Application and fees for licenses**

**(1) Application for license**

Any person desiring any such license shall make application to the Secretary. The Secretary may by regulation prescribe the information to be contained in such application and to be furnished thereafter.

**(2) License fees**

Upon the filing of an application under paragraph (1), the applicant shall pay such license fees, both individually and in the aggregate, as the Secretary determines necessary to meet the reasonably anticipated expenses for administering this chapter and the Act to prevent the destruction or dumping of farm produce, approved March 3, 1927 (7 U.S.C. 491–497). Thereafter, the licensee shall pay such license fees annually or at such longer interval as the Secretary may prescribe. The Secretary shall take due account of savings to the program when determining an appropriate interval for renewal of licenses. The Secretary shall establish and alter license fees only by rulemaking under section 553 of title 5, except that the Secretary may not alter the fees required under paragraph (3) or (4) for retailers and grocery wholesalers that are dealers. Effective on November 15, 1995, and until such time as the Secretary alters such fees by rule, an individual license fee shall equal $550 per year, plus $200 for each branch or additional business facility operated by the applicant in excess of nine such facilities, as determined by the Secretary, subject to an annual aggregate limit of $4,000 per licensee. Any increase in license fees prescribed by the Secretary under this paragraph shall not take effect unless the Secretary determines that, without such increase, the funds on hand as of the end of the fiscal year in which the increase takes effect will be less than 25 percent of the projected budget to administer this chapter and such Act for the next fiscal year. In no case may a license fee increase by the Secretary take effect before the end of the three-year period beginning on November 15, 1995.

**(3) One-time fee for retailers and grocery wholesalers that are dealers**

During the three-year period beginning on November 15, 1995, a retailer or grocery wholesaler making an initial application for a license under this section shall pay the license fee required under subparagraph (A), (B), or (C) of paragraph (4) for license renewals in the year in which the initial application is made. After the end of such period, a retailer or grocery wholesaler making an initial application for a license under this section shall pay an administrative fee equal to $100. In either case, a retailer or grocery wholesaler paying a fee under this paragraph shall not be required to pay any fee for renewal of the license for subsequent years.

**(4) Gradual elimination of annual fees for retailers and grocery wholesalers that are dealers**

In the case of a retailer or grocery wholesaler that holds a license under this section as of November 15, 1995, payments for the renewal of the license shall be made pursuant to the following schedule:

(A) For anniversary dates occurring during the one-year period beginning on November 15, 1995, the licensee shall pay a renewal fee in an amount equal to 100 percent of the applicable renewal fee (subject to the $4,000 aggregate limit on such payments) in effect under this subsection on the day before November 15, 1995.

(B) For anniversary dates occurring during the one-year period beginning at the end of the period in subparagraph (A), the licensee shall pay a renewal fee in an amount equal to 75 percent of the amount paid by the licensee under subparagraph (A).

(C) For anniversary dates occurring during the one-year period beginning at the end of the period in subparagraph (B), the licensee shall pay a renewal fee in an amount equal to 50 percent of the amount paid by the licensee under subparagraph (A).

(D) After the end of the three-year period beginning on November 15, 1995, the licensee shall not be required to pay any fee if the licensee seeks renewal of the license.

**(5) Perishable Agricultural Commodities Act Fund**

Such fee, when collected, shall be deposited in the Treasury of the United States as a special fund, without fiscal year limitation, to be designated as the "Perishable Agricultural Commodities Act Fund", which shall be available for all expenses necessary to the administration of this chapter and the Act approved March 3, 1927, referred to above. Any reserve funds in the Perishable Agricultural Commodities Act Fund may be invested by the Secretary in insured or fully-collateralized interest-bearing accounts or, at the discretion of the Secretary, by the Secretary of the Treasury in United States Government debt instruments. Any interest earned on such reserve funds shall be credited to the Perishable Agricultural Commodities Act Fund and shall be available for the same purposes as the fees de-

ADD-6

posited in such fund. Financial statements prescribed by the Director of the Office of Management and Budget for the last completed fiscal year, and as estimated for the current and ensuing fiscal years, shall be included in the budget as submitted to the Congress annually.

**(c) Use of trade names**

A licensee may conduct business in more than one trade name or change the name under which business is conducted without requiring an additional or new license. The Secretary may disapprove the use of a trade name if, in his opinion, the use of the trade name by the licensee would be deceptive, misleading, or confusing to the trade, and the Secretary may, after notice and opportunity for a hearing, suspend for a period not to exceed ninety days the license of any licensee who continues to use a trade name which the Secretary has disapproved for use by such licensee. The Secretary may refuse to issue a license to an applicant if he finds that the trade name in which the applicant proposes to do business would be deceptive, misleading, or confusing to the trade if used by such applicant.

(June 10, 1930, ch. 436, §3, 46 Stat. 533; Aug. 20, 1937, ch. 719, §5, 50 Stat. 726; June 15, 1950, ch. 254, §1, 64 Stat. 217; July 30, 1956, ch. 786, §2(a), 70 Stat. 726; Pub. L. 87–725, §§3, 4, Oct. 1, 1962, 76 Stat. 673, 674; Pub. L. 91–107, §3, Nov. 4, 1969, 83 Stat. 182; 1970 Reorg. Plan No. 2, §102, eff. July 1, 1970, 35 F.R. 7959, 84 Stat. 2085; Pub. L. 95–562, §2, Nov. 1, 1978, 92 Stat. 2381; Pub. L. 97–98, title XI, §1115(b), Dec. 22, 1981, 95 Stat. 1269; Pub. L. 100–414, §1, Aug. 22, 1988, 102 Stat. 1102; Pub. L. 101–624, title XIII, §1361, Nov. 28, 1990, 104 Stat. 3568; Pub. L. 104–48, §§3–4(b), 5(a), Nov. 15, 1995, 109 Stat. 425–427.)

REFERENCES IN TEXT

The Act to prevent the destruction or dumping of farm produce, approved March 3, 1927, referred to in subsec. (b)(2), (5), is act Mar. 3, 1927, ch. 309, 44 Stat. 1355, as amended, which is classified generally to chapter 20 (§491 et seq.) of this title. For complete classification of this Act to the Code, see Tables.

CODIFICATION

Section was formerly classified to section 553 of this title.

AMENDMENTS

1995—Pub. L. 104–48, §3(b)(1), reenacted section catchline without change.
Subsec. (a). Pub. L. 104–48, §§3(b)(1), 5(a), inserted heading and substituted "$1,000" for "$500" in first paragraph and "$250" for "$25" in two places.
Subsec. (b). Pub. L. 104–48, §3(b)(2), inserted heading.
Subsec. (b)(1). Pub. L. 104–48, §3(a)(1), (2), inserted heading, realigned margins, and struck out after second sentence "Upon the filing of the application, and annually thereafter, the applicant shall pay such fee as the Secretary determines necessary to meet the reasonably anticipated expenses for administering this chapter and the Act to prevent the destruction or dumping of farm produce, approved March 3, 1927 (7 U.S.C. 491–497), but in no event shall such fee exceed $400, plus $200 for each branch or additional business facility operated by the applicant in excess of nine such facilities, as determined by the Secretary. Total annual fees for any applicant shall not exceed $4,000 in the aggregate."
Subsec. (b)(2). Pub. L. 104–48, §4(a), added par. (2).
Subsec. (b)(3), (4). Pub. L. 104–48, §3(a)(3), added pars. (3) and (4).

Subsec. (b)(5). Pub. L. 104–48, §§3(a)(3), (4), 4(b), designated provisions of subsec. (b) relating to Perishable Agricultural Commodities Act Fund as par. (5), inserted heading, realigned margins, and struck out "The amount of money accumulated and on hand in the special fund at the end of any fiscal year shall not exceed 25 percent of the projected budget for the next following fiscal year." after "fees deposited in such fund." and "The Secretary shall give public notice of any increase to be made in the annual fee prescribed by him hereunder and shall allow a reasonable time prior to the effective date of such increase for interested persons to file their views on or objections to such increase." after "budget as submitted to the Congress annually."
Subsec. (c). Pub. L. 104–48, §3(b)(3), inserted heading.
1990—Subsec. (b). Pub. L. 101–624 substituted ". Any reserve funds in the Perishable Agricultural Commodities Act Fund may be invested by the Secretary in insured or fully-collateralized interest-bearing accounts or, at the discretion of the Secretary, by the Secretary of the Treasury in United States Government debt instruments. Any interest earned on such reserve funds shall be credited to the Perishable Agricultural Commodities Act Fund and shall be available for the same purposes as the fees deposited in such fund. The" for ": Provided, That the" and ". Financial" for ": Provided further, That financial".
1988—Subsec. (b). Pub. L. 100–414 substituted "$400, plus $200" for "$300, plus $150" and "$4,000" for "$3,000".
1981—Subsec. (b). Pub. L. 97–98 substituted "$300", "$150", and "$3,000" for "$150", "$50", and "$1,000", respectively.
1978—Subsec. (b). Pub. L. 95–562 substituted "in such application and to be furnished thereafter" for "in such application" and "$150, plus $50 for each branch or additional business facility operated by the applicant in excess of nine such facilities, as determined by the Secretary" for "$100", and inserted provisions limiting the total annual fees for any applicant to an amount not to exceed $1,000 in the aggregate and limiting the amount of money in the special fund at the end of any fiscal year to an amount not to exceed 25 percent of the projected budget for the next following fiscal year.
1969—Subsec. (b). Pub. L. 91–107 increased limitation on fees from $50 to $100.
1962—Subsec. (b). Pub. L. 87–725, §3, increased annual fee from a maximum of $25, to such fee as the Secretary determines necessary to meet the expenses of administering this chapter and the Act approved March 3, 1927, but not exceeding $50, directed the Secretary to give public notice of any increase in the annual fee and to allow reasonable time before the effective date of such increase for submission of views on, or objections to, such increase, and struck out references to the availability of the Perishable Agricultural Commodities Act Fund for administrative expenses of sections 581 to 589 of this title.
Subsec. (c). Pub. L. 87–725, §4, added subsec. (c).
1956—Subsec. (b). Act July 30, 1956, increased fee from $15 annually to not more than $25 annually.
1950—Subsec. (b). Act June 15, 1950, increased fee from $10 to $15 annually, provided for its disposition in fund, made fund available for administrative expenses, and provided for financial statements.
1937—Subsec. (a). Act Aug. 20, 1937, added second par.

EFFECTIVE DATE OF 1981 AMENDMENT

Amendment by Pub. L. 97–98 effective Dec. 22, 1981, see section 1801 of Pub. L. 97–98, set out as an Effective Date note under section 4301 of this title.

TRANSFER OF FUNCTIONS

Functions vested by law (including reorganization plan) in Bureau of the Budget or Director of Bureau of the Budget transferred to President by section 101 of 1970 Reorg. Plan No. 2. Section 102 of 1970 Reorg. Plan No. 2 redesignated Bureau of the Budget as Office of Management and Budget and offices of Director of Bu-

reau of the Budget, Deputy Director of Bureau of the Budget, and Assistant Directors of Bureau of the Budget as Director of Office of Management and Budget, Deputy Director of Office of Management and Budget, and Assistant Directors of Office of Management and Budget, respectively. Section 103 of 1970 Reorg. Plan No. 2 transferred all records, property, personnel, and funds of Bureau to Office of Management and Budget. See part I of Reorg. Plan No. 2 of 1970, set out in the Appendix to Title 5, Government Organization and Employees.

## § 499d. Issuance of license

### (a) Authority to do business; termination; renewal

Whenever an applicant has paid the prescribed fee the Secretary, except as provided elsewhere in this chapter, shall issue to such applicant a license, which shall entitle the licensee to do business as a commission merchant and/or dealer and/or broker unless and until it is suspended or revoked by the Secretary in accordance with the provisions of this chapter, or is automatically suspended under section 499g(d) of this title, but said license shall automatically terminate on the anniversary date of the license at the end of the annual or multiyear period covered by the license fee unless the licensee submits the required renewal application and pays the applicable renewal fee (if such fee is required): *Provided,* That notice of the necessity of renewing the license and of paying the renewal fee (if such fee is required) shall be mailed at least thirty days before the anniversary date: *Provided, further,* That if the renewal fee (if required) is not paid by the anniversary date the licensee may obtain a renewal of that license at any time within thirty days by paying the fee provided in section 499c(b) of this title, plus $50, which shall be deposited in the Perishable Agricultural Commodities Act fund provided for by section 499c(b) of this title: *And provided further,* That the license of any licensee shall terminate upon said licensee, or in case the licensee is a partnership, any partner, being discharged as a bankrupt, unless the Secretary finds upon examination of the circumstances of such bankruptcy, which he shall examine if requested to do so by said licensee, that such circumstances do not warrant such termination.

### (b) Refusal of license; grounds

The Secretary shall refuse to issue a license to an applicant if he finds that the applicant, or any person responsibly connected with the applicant, is prohibited from employment with a licensee under section 499h(b) of this title or is a person who, or is or was responsibly connected with a person who—

(A) has had his license revoked under the provisions of section 499h of this title within two years prior to the date of the application or whose license is currently under suspension;

(B) within two years prior to the date of application has been found after notice and opportunity for hearing to have committed any flagrant or repeated violation of section 499b of this title, but this provision shall not apply to any case in which the license of the person found to have committed such violation was suspended and the suspension period has expired or is not in effect;

(C) within two years prior to the date of the application, has been found guilty in a Federal court of having violated the provisions of sections 491, 493 to 497 of this title, relating to the prevention of destruction and dumping of farm produce; or

(D) has failed, except in the case of bankruptcy and subject to his right of appeal under section 499g(c) of this title, to pay any reparation order issued against him within two years prior to the date of the application.

### (c) Issuance of license upon furnishing bond; issuance after three years without bond; effect of termination of bond; increase or decrease in amount; payment of increase

An applicant ineligible for a license by reason of the provisions of subsection (b) of this section may, upon the expiration of the two-year period applicable to him, be issued a license by the Secretary if such applicant furnishes a surety bond in the form and amount satisfactory to the Secretary as assurance that his business will be conducted in accordance with this chapter and that he will pay all reparation orders which may be issued against him in connection with transactions occurring within four years following the issuance of the license, subject to his right of appeal under section 499g(c) of this title. In the event such applicant does not furnish such a surety bond, the Secretary shall not issue a license to him until three years have elapsed after the date of the applicable order of the Secretary or decision of the court on appeal. If the surety bond so furnished is terminated for any reason without the approval of the Secretary the license shall be automatically canceled as of the date of such termination and no new license shall be issued to such person during the four-year period without a new surety bond covering the remainder of such period. The Secretary, based on changes in the nature and volume of business conducted by a bonded licensee, may require an increase or authorize a reduction in the amount of the bond. A bonded licensee who is notified by the Secretary to provide a bond in an increased amount shall do so within a reasonable time to be specified by the Secretary, and upon failure of the licensee to provide such bond his license shall be automatically suspended until such bond is provided. The Secretary may not issue a license to an applicant under this subsection if the applicant or any person responsibly connected with the applicant is prohibited from employment with a licensee under section 499h(b) of this title.

### (d) Withholding license pending investigation

The Secretary may withhold the issuance of a license to an applicant, for a period not to exceed thirty days pending an investigation, for the purpose of determining (a) whether the applicant is unfit to engage in the business of a commission merchant, dealer, or broker because the applicant, or in case the applicant is a partnership, any general partner, or in case the applicant is a corporation, any officer or holder of more than 10 per centum of the stock, prior to the date of the filing of the application engaged in any practice of the character prohibited by this chapter or was convicted of a felony in any State or Federal court, or (b) whether the appli-

cation contains any materially false or misleading statement or involves any misrepresentation, concealment, or withholding of facts respecting any violation of the chapter by any officer, agent, or employee of the applicant. If after investigation the Secretary believes that the applicant should be refused a license, the applicant shall be given an opportunity for hearing within sixty days from the date of the application to show cause why the license should not be refused. If after the hearing the Secretary finds that the applicant is unfit to engage in the business of a commission merchant, dealer, or broker because the applicant, or in case the applicant is a partnership, any general partner, or in case the applicant is a corporation, any officer or holder of more than 10 per centum of the stock, prior to the date of the filing of the application engaged in any practice of the character prohibited by this chapter or was convicted of a felony in any State or Federal court, or because the application contains a materially false or misleading statement made by the applicant or by its representative on its behalf, or involves a misrepresentation, concealment, or withholding of facts respecting any violation of the chapter by any officer, agent, or employee, the Secretary may refuse to issue a license to the applicant.

**(e) Refusal of license**

The Secretary may refuse to issue a license to an applicant if he finds that the applicant, or in case the applicant is a partnership, any general partner, or in case the applicant is a corporation, any officer or holder of more than 10 per centum of the stock, has, within three years prior to the date of the application, been adjudicated or discharged as a bankrupt, or was a general partner of a partnership or officer or holder of more than 10 per centum of the stock of a corporation adjudicated or discharged as a bankrupt, and if he finds that the circumstances of such bankruptcy warrant such a refusal, unless the applicant furnishes a bond of such nature and amount as may be determined by the Secretary or other assurance satisfactory to the Secretary that the business of the applicant will be conducted in accordance with this chapter.

(June 10, 1930, ch. 436, §4, 46 Stat. 533; Apr. 13, 1934, ch. 120, §§4–7, 48 Stat. 585, 586; June 19, 1936, ch. 602, §2, 49 Stat. 1533; Aug. 20, 1937, ch. 719, §6, 50 Stat. 726; June 15, 1950, ch. 254, §2, 64 Stat. 218; July 30, 1956, ch. 786, §§2(b), 3, 4, 70 Stat. 726; Pub. L. 87–725, §§5–7, Oct. 1, 1962, 76 Stat. 674; Pub. L. 95–598, title III, §303, Nov. 6, 1978, 92 Stat. 2673; Pub. L. 102–237, title X, §1011(2), Dec. 13, 1991, 105 Stat. 1898; Pub. L. 104–48, §§4(c), 5(b), 12(c), Nov. 15, 1995, 109 Stat. 427, 431.)

CODIFICATION

Section was formerly classified to section 554 of this title.

AMENDMENTS

1995—Subsec. (a). Pub. L. 104–48, §§4(c), 5(b), substituted "the anniversary date of the license at the end of the annual or multiyear period covered by the license fee unless the licensee submits the required renewal application and pays the applicable renewal fee (if such fee is required)" for "any anniversary date thereof unless the annual fee has been paid" in provi-

sions before first proviso, "the necessity of renewing the license and of paying the renewal fee (if such fee is required)" for "the necessity of paying the annual fee" in first proviso and "renewal fee (if required)" for "annual fee" and "plus $50" for "plus $5" in second proviso.

Subsec. (b). Pub. L. 104–48, §12(c)(1), inserted "is prohibited from employment with a licensee under section 499h(b) of this title or" after "with the applicant," in introductory provisions.

Subsec. (c). Pub. L. 104–48, §12(c)(2), inserted at end "The Secretary may not issue a license to an applicant under this subsection if the applicant or any person responsibly connected with the applicant is prohibited from employment with a licensee under section 499h(b) of this title."

1991—Subsec. (a). Pub. L. 102–237 substituted "annual" for "anual" before "fee has been paid".

1978—Subsec. (a). Pub. L. 95–598, §303(a), inserted ", unless the Secretary finds upon examination of the circumstances of such bankruptcy, which he shall examine if requested to do so by said licensee, that such circumstances do not warrant such termination".

Subsec. (e). Pub. L. 95–598, §303(b), inserted "and if he finds that the circumstances of such bankruptcy warrant such a refusal,".

1962—Subsec. (a). Pub. L. 87–725, §5, inserted proviso that the license of any licensee shall terminate, if he, or in case the licensee is a partnership, any partner, is discharged as a bankrupt.

Subsec. (b). Pub. L. 87–725, §6, amended subsection generally, and among other changes, required refusal of a license upon showing responsible connection by the applicant, or by any person responsibly connected with him, with a person guilty of the specified conduct, without requiring that the applicant was responsible in whole or in part for such conduct, and upon the grounds specified in clause (C) relating to being found guilty in a Federal court of having violated the provisions of sections 491, 493 to 497 of this title, provided that the provisions regarding flagrant or repeated violation of section 499b of this title shall not apply where the license in such case was suspended and the suspension period has expired or is not in effect, and eliminated provisions which, notwithstanding the grounds for refusal specified in the section, permitted the Secretary to issue a license upon the applicant furnishing a bond or other satisfactory assurance that his business would be conducted in accordance with this chapter, and that he would pay reparation orders previously issued against him or which could be issued against him within two years after receiving the license, but such license could not be issued until after the expiration of one year from the revocation or from the finding that the applicant was responsible, for any flagrant or repeated violation of section 499b of this title.

Subsec. (c). Pub. L. 87–725, §7, substituted provisions which permit a license to be issued to an applicant ineligible under subsec. (b) of this section, upon expiration of the two year period applicable to him, if he furnishes a surety bond as assurance that his business will be conducted in accordance with this chapter and that he will pay all reparation orders issued against him in connection with transactions occurring within four years following issuance of license, subject to appeal under section 499g(c) of this title, or if no bond is given, permit issuance of the license after three years from the applicable order, or decision of the court on appeal, and which provide that if a bond is terminated without the Secretary's approval, the license is automatically canceled and cannot be re-issued during the four year period without a new bond, that the Secretary may order an increase or a reduction in the bond, and that a licensee notified to increase the bond must do so in a reasonable time or his license will be suspended until such bond is provided, for provisions which required the Secretary to refuse a license to an applicant, or if the applicant was a partnership, or an association or a corporation, to a partner or officer or any person holding a responsible position therein, respectively, found within two years of being guilty of violating sections 491 to 497 or 499n(b) of this title.

1956—Subsec. (a). Act July 30, 1956, §2(b), substituted "the fee provided in section 499c(b) of this title, plus $5'' for ''a fee of $20''.

Subsec. (d). Act July 30, 1956, §3, included within term "applicant" any general partner of a partnership, and officers or holders of more than 10 per centum of the stock of a corporation, and permitted the Secretary to refuse to issue a license to an applicant who was convicted of a felony in any State or Federal court.

Subsec. (e). Act July 30, 1956, §4, added subsec. (e).

1950—Subsec. (a). Act June 15, 1950, increased fee for late registration from $15 to $20, and provided for its disposition in the fund.

1937—Subsec. (a). Act Aug. 20, 1937, inserted first and second provisos.

Subsec. (b). Act Aug. 20, 1937, among other changes, inserted "Such bond shall be in an amount sufficient in the judgment of the Secretary of Agriculture to insure payment of such reparation orders" at the end.

Subsecs. (c), (d). Act Aug. 20, 1937, amended subsecs. (c) and (d) generally.

1936—Subsec. (b). Act June 19, 1936, among other changes, inserted "if he finds" after "or (3)" and "or (5)" after "section 499b".

1934—Subsec. (b). Act Apr. 13, 1934, §4, among other changes, added cls. (3) and (4).

Subsecs. (c) to (e). Act Apr. 13, 1934, §§5–7, added subsecs. (c) to (e).

EFFECTIVE DATE OF 1978 AMENDMENT

Amendment by Pub. L. 95–598 effective Oct. 1, 1979, see section 402(a) of Pub. L. 95–598, set out as an Effective Date note preceding section 101 of Title 11, Bankruptcy.

## § 499e. Liability to persons injured

### (a) Amount of damages

If any commission merchant, dealer, or broker violates any provision of section 499b of this title he shall be liable to the person or persons injured thereby for the full amount of damages (including any handling fee paid by the injured person or persons under section 499f(a)(2) of this title) sustained in consequence of such violation.

### (b) Remedies

Such liability may be enforced either (1) by complaint to the Secretary as hereinafter provided, or (2) by suit in any court of competent jurisdiction; but this section shall not in any way abridge or alter the remedies now existing at common law or by statute, and the provisions of this chapter are in addition to such remedies.

### (c) Trust on commodities and sales proceeds for benefit of unpaid suppliers, sellers, or agents; preservation of trust; jurisdiction of courts

(1) It is hereby found that a burden on commerce in perishable agricultural commodities is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, encumber or give lenders a security interest in, such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products, and that such arrangements are contrary to the public interest. This subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest.

(2) Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. Payment shall not be considered to have been made if the supplier, seller, or agent receives a payment instrument which is dishonored. The provisions of this subsection shall not apply to transactions between a cooperative association, as defined in section 1141j(a) of title 12, and its members.

(3) The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary, (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time the supplier, seller, or agent has received notice that the payment instrument promptly presented for payment has been dishonored. The written notice to the commission merchant, dealer, or broker shall set forth information in sufficient detail to identify the transaction subject to the trust. When the parties expressly agree to a payment time period different from that established by the Secretary, a copy of any such agreement shall be filed in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accountings, and other documents relating to the transaction.

(4) In addition to the method of preserving the benefits of the trust specified in paragraph (3), a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust. The bill or invoice statement must include the information required by the last sentence of paragraph (3) and contain on the face of the statement the following: "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.".

(5) The several district courts of the United States are vested with jurisdiction specifically to entertain (i) actions by trust beneficiaries to enforce payment from the trust, and (ii) actions by the Secretary to prevent and restrain dissipation of the trust.

(June 10, 1930, ch. 436, §5, 46 Stat. 534; Aug. 20, 1937, ch. 719, §7, 50 Stat. 728; Pub. L. 98–273, §1,

May 7, 1984, 98 Stat. 165; Pub. L. 102–237, title X, §1011(3), Dec. 13, 1991, 105 Stat. 1898; Pub. L. 104–48, §§6, 8(b), Nov. 15, 1995, 109 Stat. 427, 429.)

CODIFICATION

Section was formerly classified to section 555 of this title.

AMENDMENTS

1995—Subsec. (a). Pub. L. 104–48, §8(b), inserted ''(including any handling fee paid by the injured person or persons under section 499f(a)(2) of this title)'' after ''damages''.

Subsec. (c)(3). Pub. L. 104–48, §6(a), (b), struck out ''and has filed such notice with the Secretary'' before ''within thirty calendar days'' in first sentence and inserted after first sentence ''The written notice to the commission merchant, dealer, or broker shall set forth information in sufficient detail to identify the transaction subject to the trust.''

Subsec. (c)(4), (5). Pub. L. 104–48, §6(c), added par. (4) and redesignated former par. (4) as (5).

1991—Subsec. (c)(2). Pub. L. 102–237 substituted '', as'' for ''as'' before ''defined''.

1984—Subsec. (c). Pub. L. 98–273 added subsec. (c).

1937—Subsec. (a). Act Aug. 20, 1937, struck out ''paragraph (1), (2), (3), or (4) of'' after ''provisions of''.

### § 499f. Complaints, written notifications, and investigations

#### (a) Reparation complaints

##### (1) Petition; process

Any person complaining of any violation of any provision of section 499b of this title by any commission merchant, dealer, or broker may, at any time within nine months after the cause of action accrues, apply to the Secretary by petition, which shall briefly state the facts, whereupon, if, in the opinion of the Secretary, the facts therein contained warrant such action, a copy of the complaint thus made shall be forwarded by the Secretary to the commission merchant, dealer, or broker, who shall be called upon to satisfy the complaint, or to answer it in writing, within a reasonable time to be prescribed by the Secretary.

##### (2) Filing and handling fees

A person submitting a petition to the Secretary under paragraph (1) shall include a filing fee of $60 per petition. If the Secretary determines under paragraph (1) that the facts contained in the petition warrant further action, the person or persons submitting the petition shall submit to the Secretary a handling fee of $300. The Secretary may not forward a copy of the complaint to the commission merchant, dealer, or broker involved until after the Secretary receives the required handling fee. The Secretary shall deposit fees submitted under this paragraph into the Perishable Agricultural Commodities Act Fund provided for by section 499c(b) of this title. The Secretary may alter the fees specified in this paragraph by rulemaking under section 553 of title 5.

#### (b) Disciplinary violations

Any officer or agency of any State or Territory having jurisdiction over commission merchants, dealers, or brokers in such State or Territory and any other interested person (other than an employee of an agency of the Department of Agriculture administering this chapter) may file, in accordance with rules prescribed by the Secretary, a written notification of any alleged violation of this chapter by any commission merchant, dealer, or broker. In addition, any official certificates of the United States Government or States or Territories of the United States and trust notices filed pursuant to section 499e of this title shall constitute written notification for the purposes of conducting an investigation under subsection (c) of this section. The identity of any person filing a written notification under this subsection shall be considered to be confidential information. The identity of such person, and any portion of the notification to the extent that it would indicate the identity of such person, are specifically exempt from disclosure under section 552 of title 5 (commonly known as the Freedom of Information Act), as provided in subsection (b)(3) of such section.

#### (c) Investigation of complaints and notifications

##### (1) Commencing or expanding an investigation

If there appears to be, in the opinion of the Secretary, reasonable grounds for investigating a complaint made under subsection (a) of this section or a written notification made under subsection (b) of this section, the Secretary shall investigate such complaint or notification. In the course of the investigation, if the Secretary determines that violations of this chapter are indicated other than the alleged violations specified in the complaint or notification that served as the basis for the investigation, the Secretary may expand the investigation to include such additional violations.

##### (2) Issuance of complaint by Secretary; process

In the opinion of the Secretary, if an investigation under this subsection substantiates the existence of violations of this chapter, the Secretary may cause a complaint to be issued. The Secretary shall have the complaint served by registered mail or certified mail or otherwise on the person concerned and afford such person an opportunity for a hearing thereon before a duly authorized examiner of the Secretary in any place in which the subject of the complaint is engaged in business. However, in complaints wherein the amount claimed as damages does not exceed $30,000, a hearing need not be held and proof in support of the complaint and in support of respondent's answer may be supplied in the form of depositions or verified statements of fact.

##### (3) Special notification requirements for certain investigations

Whenever the Secretary initiates an investigation on the basis of a written notification made under subsection (b) of this section or expands such an investigation, the Secretary shall promptly notify the subject of the investigation of the existence of the investigation and the nature of the alleged violations of this chapter to be investigated. Not later than 180 days after providing the initial notification, the Secretary shall provide the subject of the investigation with notice of the status of the investigation, including whether the Sec-

such order that he has either taken an appeal as herein authorized or has made payment in full as required by such order his license shall be suspended automatically at the expiration of such five-day period until he shows to the satisfaction of the Secretary that he has paid the amount therein specified with interest thereon to date of payment: *Provided*, That if on appeal the appellee prevails or if the appeal is dismissed the automatic suspension of license shall become effective at the expiration of thirty days from the date of the judgment on the appeal, but if the judgment is stayed by a court of competent jurisdiction the suspension shall become effective ten days after the expiration of such stay, unless prior thereto the judgment of the court has been invalidated.

(June 10, 1930, ch. 436, §7, 46 Stat. 534; Apr. 13, 1934, ch. 120, §§11–13, 48 Stat. 587, 588; June 19, 1936, ch. 602, §3, 49 Stat. 1534; Aug. 20, 1937, ch. 719, §10, 50 Stat. 728; June 23, 1938, ch. 599, 52 Stat. 953; May 14, 1940, ch. 196, 54 Stat. 214; Pub. L. 87–725, §§9, 10, Oct. 1, 1962, 76 Stat. 675; Pub. L. 92–231, §2, Feb. 15, 1972, 86 Stat. 38; Pub. L. 102–237, title X, §1011(5), Dec. 13, 1991, 105 Stat. 1898.)

CODIFICATION

Section was formerly classified to section 557 of this title.

AMENDMENTS

1991—Subsecs. (a) to (c). Pub. L. 102–237 substituted periods for semicolons at end of subsecs. (a) to (c).

1972—Subsec. (a). Pub. L. 92–231 directed the Secretary to order commission merchants, dealers, or brokers who are the losing party to pay the prevailing party, as reparation or additional reparation, reasonable fees and expenses incurred in connection with hearings.

1962—Subsec. (c). Pub. L. 87–725, §9, limited time for filing the bond to within 30 days from and after the date of the reparation order, and required such bond to be in cash, negotiable securities having a market value of at least equivalent to the amount of bond prescribed or the undertaking of a surety company on the approved list of sureties issued by the Treasury Department.

Subsec. (d). Pub. L. 87–725, §10, lengthened period upon the expiration of which the license is suspended from ten to thirty days, and provided that if the judgment is stayed by a court of competent jurisdiction the suspension becomes effective ten days after the expiration of such stay.

1940—Subsec. (c). Act May 14, 1940, inserted proviso in first sentence.

1938—Subsec. (a). Act June 23, 1938, inserted last two sentences.

1937—Subsec. (a). Act Aug. 20, 1937, among other changes, inserted "or without hearing as provided in section 499f of this title, paragraphs (c) and (d), or upon failure of the party complained against to answer a complaint duly served within the time prescribed, or to appear at a hearing after being duly notified" after "section 499f".

Subsec. (b). Act Aug. 20, 1937, among other changes, substituted "pay the reparation award" for "comply with an order for the payment of money".

Subsec. (c). Act Aug. 20, 1937, inserted "together with a bond in double the amount of the reparation award conditioned upon the payment of the judgment entered by the court plus interest and costs, including a reasonable attorney's fee for the appellee, if the appellee shall prevail" after "upon adverse party" and struck out proviso in first sentence and "by registered mail" after "adverse party".

Subsec. (d). Act Aug. 20, 1937, inserted proviso.

1936—Subsec. (c). Act June 19, 1936, inserted proviso in first sentence and "by registered mail" after "adverse party".

1934—Subsec. (b). Act Apr. 13, 1934, §11, inserted after first sentence "The orders, writs and processes of the district courts may in these cases run, be served, and be returnable anywhere in the United States."

Subsecs. (c), (d). Act Apr. 13, 1934, §§12, 13, added subsecs. (c) and (d).

## § 499h. Grounds for suspension or revocation of license

### (a) Authority of Secretary

Whenever (1) the Secretary determines, as provided in section 499f of this title, that any commission merchant, dealer, or broker has violated any of the provisions of section 499b of this title, or (2) any commission merchant, dealer, or broker has been found guilty in a Federal court of having violated section 499n(b) of this title, the Secretary may publish the facts and circumstances of such violation and/or, by order, suspend the license of such offender for a period not to exceed ninety days, except that, if the violation is flagrant or repeated, the Secretary may, by order, revoke the license of the offender.

### (b) Unlawful employment of certain persons; restrictions; bond assuring compliance; approval of employment without bond; change in amount of bond; payment of increased amount; penalties

Except with the approval of the Secretary, no licensee shall employ any person, or any person who is or has been responsibly connected with any person—

(1) whose license has been revoked or is currently suspended by order of the Secretary;

(2) who has been found after notice and opportunity for hearing to have committed any flagrant or repeated violation of section 499b of this title, but this provision shall not apply to any case in which the license of the person found to have committed such violation was suspended and the suspension period has expired or is not in effect; or

(3) against whom there is an unpaid reparation award issued within two years, subject to his right of appeal under section 499g(c) of this title.

The Secretary may approve such employment at any time following nonpayment of a reparation award, or after one year following the revocation or finding of flagrant or repeated violation of section 499b of this title, if the licensee furnishes and maintains a surety bond in form and amount satisfactory to the Secretary as assurance that such licensee's business will be conducted in accordance with this chapter and that the licensee will pay all reparation awards, subject to its right of appeal under section 499g(c) of this title, which may be issued against it in connection with transactions occurring within four years following the approval. The Secretary may approve employment without a surety bond after the expiration of two years from the effective date of the applicable disciplinary order. The Secretary, based on changes in the nature and volume of business conducted by the licensee, may require an increase or authorize a

reduction in the amount of the bond. A licensee who is notified by the Secretary to provide a bond in an increased amount shall do so within a reasonable time to be specified by the Secretary, and if the licensee fails to do so the approval of employment shall automatically terminate. The Secretary may, after thirty days notice and an opportunity for a hearing, suspend or revoke the license of any licensee who, after the date given in such notice, continues to employ any person in violation of this section. The Secretary may extend the period of employment sanction as to a responsibly connected person for an additional one-year period upon the determination that the person has been unlawfully employed as provided in this subsection.

**(c) Fraud in procurement**

If, after a license shall have been issued to an applicant, the Secretary believes that the license was obtained through a false or misleading statement in the application therefor or through a misrepresentation, concealment, or withholding of facts respecting any violation of this chapter by any officer, agent, or employee, he may, after thirty days' notice and an opportunity for a hearing, revoke said license, whereupon no license shall be issued to said applicant or any applicant in which the person responsible for such false or misleading statement or misrepresentation, concealment, or withholding of facts is financially interested, except under the conditions set forth in section 499d(b) of this title.

**(d) Injunction**

In addition to being subject to the penalties provided by section 499c(a) of this title, any commission merchant, dealer, or broker who engages in or operates such business without a valid and effective license from the Secretary shall be liable to be proceeded against in any court of competent jurisdiction in a suit by the United States for an injunction to restrain such defendant from further continuing so to engage in or operate such business, and, if the court shall find that the defendant is continuing to engage in such business without a valid and effective license, the court shall issue an injunction to restrain such defendant from continuing to engage in or to operate such business without such license.

**(e) Alternative civil penalties**

In lieu of suspending or revoking a license under this section when the Secretary determines, as provided by section 499f of this title, that a commission merchant, dealer, or broker has violated section 499b of this title or subsection (b) of this section, the Secretary may assess a civil penalty not to exceed $2,000 for each violative transaction or each day the violation continues. In assessing the amount of a penalty under this subsection, the Secretary shall give due consideration to the size of the business, the number of employees, and the seriousness, nature, and amount of the violation. Amounts collected under this subsection shall be deposited in the Treasury of the United States as miscellaneous receipts.

(June 10, 1930, ch. 436, §8, 46 Stat. 535; Apr. 13, 1934, ch. 120, §14, 48 Stat. 588; Aug. 20, 1937, ch.

719, §11, 50 Stat. 730; July 30, 1956, ch. 786, §5, 70 Stat. 727; Pub. L. 87–725, §11, Oct. 1, 1962, 76 Stat. 675; Pub. L. 102–237, title X, §1011(6), Dec. 13, 1991, 105 Stat. 1898; Pub. L. 104–48, §§11, 12(b), Nov. 15, 1995, 109 Stat. 430, 431.)

CODIFICATION

Section was formerly classified to section 558 of this title.

AMENDMENTS

1995—Subsec. (b). Pub. L. 104–48, §12(b), inserted at end "The Secretary may extend the period of employment sanction as to a responsibly connected person for an additional one-year period upon the determination that the person has been unlawfully employed as provided in this subsection."

Subsec. (e). Pub. L. 104–48, §11, added subsec. (e).

1991—Subsec. (a). Pub. L. 102–237 redesignated cls. (a) and (b) as (1) and (2), respectively, and substituted a period for semicolon at end.

1962—Subsec. (b). Pub. L. 87–725 amended subsec. (b) generally, and among other changes, provided that any licensee hiring any person without the Secretary's approval in violation of this section, after notice and opportunity for hearing, may have his license suspended or revoked, that the restrictions shall apply to persons found, after notice and opportunity for hearing, to have committed any flagrant or repeated violation of section 499b of this title, but not where such violator's license was suspended and the suspension has expired or is not in effect, and shall also apply to persons against whom there is a unpaid reparation award issued within two years, subject to appeal under section 499g(c) of this title, permitted the Secretary to approve employment at any time following nonpayment of a reparation award, or after one year following the revocation or finding of flagrant and repeated violation of section 499b of this title, if the licensee furnishes a bond as assurance that his business will be conducted in accordance with this chapter and he will pay all reparation awards issued within four years following approval, subject to appeal under section 499g(c) of this title, or without bond after two years from the effective date of the disciplinary order, authorized the Secretary to increase or decrease the amount of bond, and required licensees notified of an increased bond to provide such in a reasonable time or the approval of employment will terminate.

1956—Subsec. (b). Act July 30, 1956, provided for suspension of licenses, and restricted authority to permit employment to those cases where licenses have been revoked or suspended for failure to pay a reparation award.

1937—Subsec. (a). Act Aug. 20, 1937, among other changes, inserted cl. (a) designation and inserted "or (b) any commission merchant, dealer, or broker has been found guilty in a Federal court of having violated section 499n(b) of this title" after "section 499b of this title".

Subsec. (b). Act Aug. 20, 1937, amended subsec. (b) generally.

Subsecs. (c), (d). Act Aug. 20, 1937, added subsecs. (c) and (d).

1934—Subsec. (b). Act Apr. 13, 1934, added subsec. (b).

**§ 499i. Accounts, records, and memoranda; duty of licensees to keep; contents; suspension of license for violation of duty**

Every commission merchant, dealer, and broker shall keep such accounts, records, and memoranda as fully and correctly disclose all transactions involved in his business, including the true ownership of such business by stockholding or otherwise. If such accounts, records, and memoranda are not so kept, the Secretary may publish the facts and circumstances and/or,

ADD-13